TECHNICOLOR MOTION PICTURE CORP. v. WESTOVER.

No. 13151.

United States Court of Appeals, Ninth Circuit.

Feb. 11, 1953.

Albert E. Arent, J. Fay Hall, Jr. and Posner, Berge, Fox & Arent, Washington; D. C., George W. Cohen, Beverly Hills, Cal., for appellant.

Ellis N. Slack, Acting Asst. Atty. Gen., Robert N. Anderson and Carolyn R. Just,

Sp. Assts. to Atty. Gen., Walter S. Binns, U. S. Atty., Los Angeles, Cal., for appellee.

Before STEPHENS and ORR, Circuit Judges, and McCORMICK, District Judge.

McCORMICK, District Judge.

This is an appeal by Technicolor Motion Picture Corporation, a corporation, from an adverse judgment of the District Court which denied recovery against Harry C. Westover individually and as Collector of Internal Revenue of a manufacturer's excise tax amounting to $19,495.57 paid by the appellant on September 14, 1944. Appellant is hereinafter also called "Technicolor," and appellee "Collector."

The assessment and collection of such tax claimed under Sections 3406(a) (4) and 3444(a) (1), Internal Revenue Code,[1] related to the construction and use by Technicolor of certain equipment in its laboratory known as a "transfer machine" which it specially built pursuant to its own design after extensive research, and placed in essential and indispensible use about August, 1944, in its sole business of photographing and processing color motion pictures for commercial use. Technicolor is not otherwise engaged in the business of manufacturing or at all engaged in selling photographic equipment.

However, while the transfer machine is not commercially available to others, it is covered by patents controlled by Technicolor which, while their inventive breadth is not before us, such protective instruments of monopoly were held in the court below to furnish relevant matter which under applicable law[2] warranted the Collector to compute and collect a use tax on such transfer machine.

1. Section 3406(a) (4), Internal Revenue Code, as amended by Revenue Act 1942, § 607, imposes an excise tax of 25 per cent on "photographic apparatus and equipment" and on "any apparatus or equipment designed especially for use in the taking of photographs or motion pictures or in developing, printing, or enlarging photographs or motion pictures". Section 3444, Internal Revenue Code, provides that the excise tax attaches to the use of articles manufactured or produced, with exceptions not pertinent here, in the same manner as if such article were sold. See, also, Regulation 46, Section 316.120 (as added by T.D.5099, 1941–2, Cum.Bull.267), which gives examples of taxable apparatus and equipment which are explicitly stated to be descriptive and not all-inclusive.

2. Section 3444, Internal Revenue Code, [as amended by Section 553(d) of the Revenue Act of 1941], 26 U.S.C., (1946 Ed.), § 3444, Treasury Regulations 46, (1940 Ed.), Sections 316.7, 316.15.

The transfer machine, which, as before mentioned, is specially adapted for Technicolor's use in applying color to motion picture films in accordance with Technicolor's particular three-color process, is a large apparatus measuring approximately 76 feet in length, 12 feet in height, and 8 feet in width, and weighing approximately 29 tons. The cost of construction of this machine to Technicolor was $77,982.27, and the principal sum in suit is 25 per cent of said amount which the Commissioner computed as taxable under the hereinafter mentioned tax laws and regulations promulgated pursuant thereto referred to in footnote. The machine is built in two parts, separated from one end to the other by a small aisle for ease of access. The machine consists primarily of steel structures on which are mounted various film pulleys, driving mechanism, control mechanism, tanks or vats, drying cabinets, duct work, etc.

In the Technicolor process, the three color aspects of the scene in front of the camera—red, green and blue—are photographed and recorded upon three separate negatives simultaneously. These negatives are developed in substantially the same manner as any ordinary negatives for black and white film. From each of these negatives, a separate matrix is produced on a special matrix-type of positive film stock. Each finished matrix has a gelatin image in relief, its surface consisting of hills and valleys in the hardened gelatin.

In addition to the preparation of matrices, as described above, there also takes place outside the transfer machine the preparation of a receiving film which consists of a cine positive film processed to remove the silver halide and leaving the gelatin which receives the dye images. This receiving film may be entirely clear and transparent or may have a clear transparent picture area within dividers called picture frames which have previously been printed upon the film along with the sound track. By the time the receiving film enters the transfer machine the receiving film is not sensitive to light or any particular color.

Inside the transfer machine the three matrices are used to pick up and transfer dyes to the receiving film. Each matrix, in turn, is passed through an appropriate dye bath, where it takes up dye in proportion to the thickness of the gelatin relief image of the matrix. Dyes which are particularly adapted to use with the three matrices have been developed. These dyes are complementary to the colors in the scene photographed by the three original negative records. The matrix produced from the red negative record is passed through a bath of cyan dye, the color complementary to red. Similarly, the matrix produced from the blue negative record is passed through a bath of yellow dye, and that produced from the green negative record is passed through a bath of magenta dye.

When the receiving film enters the transfer machine it is moistened and then placed by mechanical means in physical contact with a matrix which has just received its appropriate dye bath. The receiving film and the matrix, in physical contact, travel along the length of the machine in an enclosed duct, during which time the receiving film absorbs the dye image and is dried. The process is then repeated with each of the other two matrices and their particular colors of dye. When the dyes from all three matrices have been thus transferred to the receiving film it becomes the final finished color film and is then ready for projection. In the use of the transfer machine it is necessary that temperatures and the concentration of the dye in the matrices be under careful control. Mechanical precision must be maintained to very close tolerances of only a fraction of a thousandth of an inch to insure perfect registry of the several color patterns upon the final film.

■ Technicolor filed its first claim for refund of the payment in suit on January 8, 1945. Later, in compliance with the suggestion of an agent of the Bureau of Internal Revenue at Los Angeles for itemization of the taxability of equipment in its film processing plant, Technicolor under date of March 28, 1946, specified as in contemplation of construction by it in an expansion program six transfer machines "for placing color on blank film" at "unit cost of $120,000.00." Premising his action

on the statement of Technicolor in its letter of March 28, 1946, that the contemplated transfer machines were equipment "for placing color on blank film" and therefore designed for use in the manufacture of unexposed color motion picture film rather than in the developing and printing of film under Technicolor's process, the Commissioner of Internal Revenue by letters dated August 19, 1947 and November 4, 1948, revoked an earlier action wherein by letter dated May 3, 1946, it was held that no excise tax would attach to the use by Technicolor of the "6 transfer machines" referred to in Technicolor's above mentioned letter of March 28, 1946. While the transfer machine that is involved in this appeal is a counterpart of the aforesaid contemplated transfer machines, the erroneously based assumption of the Government agent cannot limit or restrict the scope and application of the pertinent statutes under consideration. It is the statute which finally governs. Royal Indemnity Co. v. U. S., 313 U.S. 289, 294, 61 S.Ct. 995, 85 L.Ed. 1361; Chicago Flag & Decorating Co. v. U. S., 7 Cir., 119 F.2d 413.

The crucial issues under the record before this court are twofold: (1) Did the District Court err in finding and holding the Technicolor transfer machine a taxable article under Section 3406(a)(4) of the Internal Revenue Code?; and, (2) Was there error in the District Court's finding and holding that the use of Technicolor's transfer machine by taxpayer indispensably in its business of photographing and processing color motion pictures was a taxable use under Section 3444(a)(1) of the Internal Revenue Code, and if so, is there a reasonable and adequate measure provided which enabled the Commissioner to compute the applicable tax?

The specifications, importance and mode of operation of the transfer machine in Technicolor's business is covered by a written stipulation introduced at the trial. This stipulation of facts however is not *per se* determinative of the basic questions in the case and it was not so considered by the trial judge as is evidenced by his memorandum opinion in the record before this court.

Color photography being a specific art and technic, it was incumbent upon the litigants to produce opinion evidence to elucidate by appropriate expert testimony descriptive of the technical functioning and aspect of the transfer machine that it was taxable "apparatus or equipment" under Sections 3406(a)(4), and 3444(a)(1), Internal Revenue Code.

Two well qualified witnesses gave extended evidence in this regard. One was called by Technicolor and the other by the Collector. The only substantial conflict in their expert opinions lies in their respective technical characterization of the dye absorption factors actuated by means of the transfer machine in what is known as the imbibition process that is peculiar to production of motion pictures in color photography. The one upon whose testimony the trial judge placed the greater weight of the evidence, as indicated by the record before us, described the Technicolor process accomplished by the transfer machine as a photographic process. The witness called by Technicolor disagreed with such characterization because light or other radiation is not used in the Technicolor film coloring action of the process. This view, we think, fails to appreciate the osmotic impression or imprinting step ultimately utilized in the transfer machine which is the efficiently designed means of developing and producing the final finished color film of the appellant. And, moreover, the record indisputably shows that color photographs are commercially manufactured by another concern in the photographic arts industry by an imbibition process similar in principle to the Technicolor process in which no light or radiant energy is used.

Color photography as distinguished from the art and technique of black and white photography—in other words simple or elementary photography—which connotes and involves light, has resulted from improved and progressive techniques and has been defined as the production of colored images by physical or chemical technique other

than hand coloring.[3] This definition would clearly read upon the means operating within the transfer machine whereby the final finished color film is made ready for projection. Such is the desideratum of Technicolor and it is attained by the physical means of the transfer machine which processes and changes a simple photographic film into a colored motion picture for commercial use by Technicolor. Cf. Warner Bros. Pictures, Inc., v. Westover, D.C.S.D. Cal. 1947, 70 F.Supp. 111.

There appears in the record a corroborative statement, by Technicolor itself, of the expert witness called by the Collector, who described the process operating in and by the transfer machine as a photographic process. The Manufacturer's Excise Return Form 728 filed by Technicolor for the month of August, 1944, bears the notation "Under Section 3406(a)(4), Photographic Apparatus 16mm photographic equipment manufactured, (W.O. No. 4297)."

■ We think the evidence warranted the District Court in finding and holding the transfer machine to be a taxable photographic article under Section 3406(a)(4), Internal Revenue Code, and that such determination should not be vitiated on appeal. Rollingwood Corp. v. Commissioner, 9 Cir., 190 F.2d 263.

■ The appellant's brief predicates the right to recover the amount paid to the Collector as a manufacturer's excise tax because no transfer machines or any similar articles are sold by "anybody" in the ordinary course of trade.

Such position fails to consider the essential and business use of the transfer machine by Technicolor in its patented process of producing motion picture color film. Such use is taxable *per se* under the clear terms of Section 3444 of the Internal Revenue Code and applicable Regulations duly promulgated.[4] The section [as amended by

Section 553(d) of the Revenue Act of 1941], reads in *pari materia*:

"§ 3444. Use by manufacturer, producer, or importer.

"(a) If—

"(1) any person manufactures, produces, or imports an article * * * and uses it * * *

he shall be liable for tax under this chapter in the same manner as if such article was sold by him, and the tax (if based on the price for which the article is sold) shall be computed on the price at which such or similar articles are sold, in the ordinary course of trade, by manufacturers, producers, or importers thereof, as determined by the Commissioner."

■ Technicolor's argument ignores the words and implications of the "use" provisions of this Revenue Act which introduces and imposes a tax on the privilege of commercial use by the manufacturer or producer of a taxable article. In this respect appellant's argument does violence to an elementary rule of statutory construction which requires that effect must be given if possible to all words and parts of a statute so that none will be insignificant or meaningless. Washington Market Co. v. Hoffman, 101 U.S. 112, 116, 25 L.Ed. 782.

It is thus clear that salability of an article within the purview of Section 3444 is not the criterion of the taxing mandate of this specific revenue measure. Such construction avoids and renders meaningless the significant words that attach the tax to the use of a pertinent article "in the same manner as if such article were sold."

The language of District Judge Yankwich in Warner Bros. Pictures, Inc., v. Westover, supra, is apt to the matter just considered, where he stated [70 F.Supp. 114]:

---

3. Chemical Dictionary, Hackh, page 563, and also page 193, where color photography is defined as "any mechanical process which records the form and color of an object by means of photography."

See, also topic, Color Photography, 17 Encyclopaedia Britannica (1948 Ed.), pp. 815, 817.

4. See footnote 2, infra.

"The history of excise taxes follows the usual pattern: From humble beginnings it has grown to include a large variety of products which are taxed either when sold by a manufacture or in the hands of a person who manufactures them for his own use.

"So here the Congress, in Section 3406(a)(4) taxes the manufacturer on the sale of certain products and in Section 3444, *to equalize matters*, taxes the person who makes the same articles for his own use."

■ The final contention of Technicolor is that the Commissioner lacked authority to determine the amount of the tax on Technicolor's use of the transfer machine because there being no established trade in or market for this apparatus or a similar article there is thus no value on which a use tax may be computed and therefore appellant argues that the District Court erroneously concluded that the Commissioner's determination and assessment of the tax of $19,495.57 was correct. Such contention, if adopted, would facilitate flagrant irregularities in use tax obligations and would tend to frustrate the equalizing factors in the collection of use taxes under Section 3444 and concomitant Regulations. These potentialities should be avoided.

The absence of an established trade in or market for the transfer machine is likely not due to any intrinsic undesirability of the article but rather to the business advantage that is inherently derived and that likewise inures to Technicolor alone by its patent protection of the transfer equipment. The fact that Technicolor in 1946 estimated its own needs as requiring six additional transfer machines at a price of $120,000.00 each, warrants an assumption that were it not for Technicolor's patent restrictions there would be a market demand for the transfer machine in other enterprises interested in the production of color motion pictures and also in other industries working in or with color photography.

It is also significant on the market probability of an uncontrolled transfer machine that Technicolor itself has considered the article of such utility and value in the business of photographing and processing color motion pictures because it appears that Technicolor has actually manufactured a second transfer machine for its own use.

Appellant's argument, as we have suggested, completely lifts out of Section 3444 the explicit congressional mandate that one who manufactures an article and uses it commercially "shall be liable for tax under this chapter, [i. e., for an article described in Section 3406(a)(4) of Internal Revenue Code] in the same manner as if such article were sold by him."

■ It follows that neither a sale nor a market is a prerequisite to tax liability of one who, like Technicolor, perforce of patent right dominates the field of the business use of an article that is taxed under the denomination of "Manufacturer's Excise Tax" in Chapter 29, Subchapter A of the Internal Revenue Code.

■ The unequivocal language of Section 3444 enjoined upon the Collector the duty of collecting the statutory use tax. This duty is implemented by Sections 316.7 and 316.15 of Regulation 46 which conjointly provide, with an exception not material here, that the tax "will be computed on the basis of the fair market price of the article," provided further that when a sale is not at arm's length and the price is less than the fair market price "the tax is to be computed upon a fair market price to be computed by the Commissioner." Since the price at which an article is normally sold in the ordinary course of trade is the manufacturing cost with an additional item of profit, a computation of the tax (where there is a use of the taxed article but no sale of it) which as here is based solely on the cost of construction of the article to the taxpayer is more than reasonable and is tantamount to a fair market price which the Regulations authorize the Commissioner to compute against the taxpayer.

The judgment of the District Court is

Affirmed.