STRICK CORPORATION,
Appellant/Cross-Appellee,

v.

UNITED STATES of America,
Appellee/Cross-Appellant.

Nos. 82–1272, 82–1273.

United States Court of Appeals,
Third Circuit.

Argued June 9, 1983.

Decided Aug. 2, 1983.

Rehearing and Rehearing En Banc
Denied Nov. 7, 1983.

Mervin M. Wilf (argued), Philadelphia, Pa., for appellant/cross-appellee.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Robert T. Duffy, Laurie

A. Snyder (argued), Tax Div., Dept. of Justice, Washington, D.C., for appellee/cross-appellant.

Before SEITZ, Chief Judge, SLOVITER, Circuit Judge, and SAROKIN, District Judge.*

## OPINION OF THE COURT

SAROKIN, District Judge.

The cross appeals before the court in this matter involve when the federal manufacturer's excise tax should be imposed and the proper method for computing the tax. Appellant and cross-appellee Strick Corporation ("Strick") appeals from a judgment of the district court which denied its claim for a refund of an alleged overpayment of the excise tax, plus interest, during all calendar quarters of 1974 through 1978. The taxpayer claimed below that transfers of its products between itself and a related corporation for a fair market price were not sales within the meaning of section 4061(a) of the Internal Revenue Code of 1954 (the "Code"). Appellee and cross-appellant United States appeals from that part of the same judgment which invalidated the so-called "cost-floor alternative" method of

computing the excise tax and upheld Strick's claim of a tax credit for overpayment of tax, plus interest, from the beginning of 1972 through the first quarter of 1978.

We affirm the decision of the district court denying the taxpayer's refund claim in connection with transfers to the related corporation, but on a ground different from that relied upon below. We reverse the determination of the court below that the cost-floor method of computation is invalid.

## I. *THE GOVERNMENT'S APPEAL—THE COST–FLOOR ALTERNATIVES*

Strick is a Pennsylvania corporation which engages principally in the manufacture of truck and truck trailer chassis and bodies. As such, pursuant to section 4061(a) of the Code, it is subject to a manufacturer's excise tax of 10% of the price for which it sells its products.[1]

During the years 1972 to 1978 inclusive, Strick sold substantially all of its truck and trailer bodies directly to user-consumers ("at retail"). Under these circumstances, the manufacturer's excise tax is computed on a constructive wholesale sale price, "as determined by the Secretary."[2] Regula-

---

* Hon. H. Lee Sarokin, United States District Judge for the District of New Jersey, sitting by designation.

1. Section 4061(a) of the Code provides in pertinent part:

   (1) Tax imposed.—There is hereby imposed upon the following articles ... sold by the manufacturer, producer, or importer a tax of 10 percent of the price for which so sold, ...
   Automobile truck chassis.
   Automobile truck bodies.
       *    *    *    *    *    *
   Truck and bus trailer and semitrailer chassis.
   Truck and bus trailer and semitrailer bodies.
   Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.
   A sale of an automobile truck, bus, truck, or bus trailer or semitrailer shall, for the purposes of this subsection, be considered to be a sale of a chassis and of a body enumerated in this subsection.
   26 U.S.C. § 4061(a) (Supp. V 1981).

2. During the relevant time period, the statute provided:

   (1) If an article is—
     (A) sold at retail,
     (B) sold on consignment, or
     (C) sold (otherwise than through an arm's length transaction) at less than the fair market price,
   the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. In the case of an article sold at retail, the computation under the preceding sentence shall be on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. This paragraph shall not apply if paragraph (2) applies.
   Sec. 4216(b)(1) of the Code, *as amended* by the Excise Technical Changes Act of 1958, Pub.L. 85–859, § 115, 72 Stat. 1275, 1279 (codified as amended at 26 U.S.C. § 4216(b)(1) (Supp. V 1981).

tions issued pursuant to the statute provide that in the absence of an established bona fide practice of selling articles to wholesale distributors, "a fair market price will be determined by the Commissioner." 26 C.F.R. § 148.1–5 (1982). The price thus determined may not exceed the actual retail price of the article. *Id.* In a revenue ruling issued in 1954, the IRS determined that the constructive wholesale price would be the higher of 75% of the retail price of the truck or trailer body or the manufacturer's costs of manufacturing ("the cost-floor alternative"). Rev.Rul. 54–61, 1954–1 C.B. 259. It is undisputed that Strick is a high-cost manufacturer and that during the 1972–1978 period, its manufacturing costs exceeded 75% of the retail price. Strick therefore paid excise tax based on its cost of manufacture during this period.

Section 4216(b) was amended in 1978 to preclude use of the administratively developed cost-floor alternative as a basis for determining a constructive wholesale price. Pub.L. 95–458, 92 Stat. 1255.[3] In October 1978, Strick filed claim for a tax credit in the amount of $5,046,096, later reduced to $4,758,957, alleging that the cost-floor alternative method of calculation was invalid. Pursuant to section 6416(f) of the Code, Strick took a credit for this amount on excise tax returns filed for the third and fourth quarters of 1978 and the first quarter of 1979. The government has filed a counterclaim for this amount. The amount of the claimed credit represents the difference between the taxes paid from 1972 through the first two quarters of 1978 and the amount that would have been paid if the tax had been calculated on 75% of the established retail price. The district court sustained the taxpayer's claim. The government appeals from this decision.

The district court held that the cost-floor alternative contained in Revenue Ruling 54–61 was invalid because, contrary to the congressional intent that the constructive sales provisions be administered uniformly, the cost-floor alternative puts a high-cost manufacturer such as Strick at a competitive disadvantage. The government contends that Congress never contemplated perfect uniformity in tax liability and intended only to avoid, insofar as possible, inequalities between manufacturers selling at wholesale and those selling at retail. The government also argues that the taxpayer has not met its burden under section 6416(a) of the Code to demonstrate that it has not passed along the cost of the allegedly excessive tax to its customers.

The evidence below was as follows: The truck and truck trailer manufacturing industry is highly competitive and sales may be won or lost based on as little as a $50 or $100 difference in the price offered by competitors. Strick incurs higher manufacturing costs than do some of its larger, vertically integrated competitors because Strick purchases many component parts from outside sources. Calculating the excise tax

---

3. Section 4216(b)(1) currently provides:

(b) Constructive sale price.—
(1) In general.—If an article is—
(A) sold at retail
(B) sold on consignment, or
(C) sold (otherwise than through an arm's length transaction) at less than the fair market price,
the tax under this chapter shall (if based on the price for which the article is sold) be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. In the case of an article sold at retail (other than an article the sale of which is taxable under section 4061(a)), the computation under the preceding sentence shall be on whichever of the following prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary. In the case of an article the sale of which is taxable under section 4061(a) and which is sold at retail, the computation under the first sentence of this paragraph shall be a percentage (not greater than 100 percent) of the actual selling price based on the highest price for which such articles are sold by manufacturers and producers in the ordinary course of trade (*determined without regard to any individual manufacturer's or producer's cost*). This paragraph shall not apply if paragraph (2) applies.
26 U.S.C. § 4216(b)(1) (Supp. V 1981). (Emphasis supplied).

against Strick's already higher costs increases the taxpayer's burden relative to others in the industry. The economic disadvantage created by the cost-floor alternative method is exacerbated when the volume of orders is low. During these periods, the cost per unit rises and so therefore does the excise tax. There was also testimony at trial that audit expenses for a manufacturer paying the excise tax on the cost-floor alternative basis were significantly higher. Strick treats the manufacturer's excise tax as a fixed cost and factors it into the price offered to customers. Customers ordinarily do not inquire into the tax component.

*Standard of Review*

■ As the district court recognized, it is settled law that administrative rules contained in treasury regulations are not to be disturbed unless they are plainly contrary to statute. *Commissioner v. South Texas Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). This deference extends to revenue rulings. *Whattoff v. United States,* 355 F.2d 473, 478 (8th Cir.1966); *Commissioner v. O. Liquidating Corporation,* 292 F.2d 225, 231 (3d Cir.), *cert. denied,* 368 U.S. 898, 82 S.Ct. 177, 7 L.Ed.2d 94 (1961).

■ In assessing whether a treasury regulation is consistent with the congressional mandate, the Supreme Court has stated that the court must look to whether the regulation harmonizes with the plain language of the statute, its origin and its purpose. *National Muffler Dealers Association, Inc. v. United States,* 440 U.S. 472, 477, 99 S.Ct. 1304, 1307, 59 L.Ed.2d 519 (1979). The regulation will have particular force if issued contemporaneously with the governing statute. *Id.* Other relevant considerations are the length of time the regulation has been in effect, the reliance that has been placed on it, the consistency of the interpretation expressed and the degree of scrutiny that Congress has devoted to the regulation during the time it has been in effect. *Id.* These considerations also appear relevant where the challenged administrative interpretation is expressed in a revenue ruling. However, the court recog-

nizes that although a revenue ruling may provide some guidance, it is not entitled to the same deference which is extended to a treasury regulation.

Although Strick emphasizes the competitive disadvantage in which it is placed by virtue of the cost-floor alternative and although the district court made a factual finding to that effect, the issue is whether this competitive disadvantage makes the method plainly contrary to section 4216(b). The parties concede that this issue is purely a question of law and is fully reviewable. *See Joseph Lupowitz Sons, Inc. v. Commissioner,* 497 F.2d 862, 864 (3d Cir.1974). It is also clear that, despite the rejection of the cost-floor alternative by Congress in 1978, the validity of the ruling must be examined as of the time of its issuance and at each point of significant amendment to the statute thereafter. The legislative history accompanying Public Law 95–458 expressly states that no inference is to be drawn from the amendment "with regard to controversies between taxpayers and the Service concerning either the validity of the cost-floor rule or determinations of cost for taxable transactions which occurred before the effective date of the legislation." S.Rep. No. 95–1127, 95th Cong.2d Sess. 3, *reprinted in* 1978 U.S.Code Cong. & Ad.News 2904, 2907. *See also United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960); *F.W. Fitch Co. v. United States,* 323 U.S. 582, 586 n. 2, 65 S.Ct. 409, 412 n. 2, 89 L.Ed. 472 (1944).

*Discussion*

■ Based upon a careful review of the prior versions of section 4216(b), the relevant legislative history and the relevant case law, we conclude that the promulgation of the cost-floor alternative was a valid exercise of the Commissioner's discretionary authority under the statute.

We note initially that the plain language of the governing statute expressly grants discretionary power to the Secretary to determine a constructive sales price. Thus, if an article is sold at retail, the tax imposed by section 4061(a) is to be "computed on the price for which such articles are sold, in the

ordinary course of trade, by manufacturers or producers thereof, as determined by the Secretary." 26 U.S.C. § 4216(b)(1) (Supp. V 1981). This discretionary grant may be traced back to section 3441(b) of Chapter 29 of the Internal Revenue Code of 1939, which also provided that in the case of a manufacturer who sold only at retail, the excise tax imposed by the chapter would "... be computed on the price for which such articles are sold, in the ordinary course of trade, by manufacturers or producers thereof, as determined by the Commissioner." Internal Revenue Code of 1939, c. 29, § 3441(b), 53 Stat. 1, 416 (*repealed,* 1951). The plain language of the statute, therefore, reveals a consistent and expressly stated congressional policy to accord the Secretary broad discretion in fixing a constructive sales price.

The legislative history of the constructive sales price provision reflects an origin and purpose to create an artificial wholesale selling price for manufacturers who sold only at retail. Because the excise tax is ordinarily levied against the wholesale selling price, a constructive price was needed for manufacturers selling at retail so that the tax burden on these manufacturers would approximate the norm. *See Continental Truck Industries, Inc. v. United States,* 343 F.Supp. 408, 410–11 (E.D.N.Y. 1972). Thus, the report of the House of Representatives accompanying the Revenue Act of 1932, which first imposed the manufacturer's excise tax, stated:

> It is of utmost importance that the tax be imposed and administered uniformly and without discrimination. Each member of a competitive group must pay upon substantially the same basis as all his competitors, even though his sales methods may differ. Consequently, the bill requires that every effort be made to ascertain the manufacturers' or producers' price at the place of manufacture or production. In the case of those commodities which are ordinarily sold at wholesale, this price will be the price at which the manufacturer sells to the wholesaler, even though the particular sale is at retail. This price may be established with

respect to any particular sale or class of sales, for example, by existing wholesale prices, or by a system of discounts from retail prices or by building up from cost of production, whichever method may be the most practical.

H.R.Rep. No. 708, 72d Cong. 1st Sess., *reprinted* in 1939–1 C.B. (Part 2) 457, 480. (Hereafter "1932 House Report").

Section 4216(b) was significantly amended in 1958. A special rule was added to cover the case where a manufacturer sold to the consumer ("at retail") *or to a retailer* in an arms length transaction where sales at retail or to retailers were not the custom in the industry and where the manufacturer had a practice of selling to at least one wholesale distributor in an arms length transaction for prices that were determined without regard to tax benefits. In these circumstances, the manufacturer's excise tax was computed upon the lower of "(i) the price for which such article is sold, or (ii) the highest price for which such articles are sold by such manufacturer ..., to wholesale distributors (other than special dealers)." Excise Tax Technical Changes Act of 1958, Pub.L. 85–859, § 115, 72 Stat. 1275, 1279 (codified as amended at 26 U.S.C. § 4216(b)(2)). Again, the purpose of the amendment apparently was to accommodate the manufacturer-retailer distribution pattern within a statutory scheme which had provided previously only for a manufacturer-consumer or manufacturer-wholesaler pattern of distribution. *See Continental Truck Industries, Inc.,* 343 F.Supp. at 410–11. The legislative history accompanying the 1958 amendments emphasizes the need to equalize, as far as possible, the tax burden between manufacturers choosing the former merchandising method and those choosing either of the latter two. S.Rep. No. 2090, 85th Cong.2d Sess., *reprinted in* 1958 U.S.Code Cong. & Ad.News 4395, 4415 (hereafter "1958 Senate Report").

At the same time, the following sentence was added to section 4216(b)(1):

> In the case of an article sold at retail, the computation under the previous sentence shall be on whichever of the following

prices is the lower: (i) the price for which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers and producers thereof, as determined by the Secretary. This paragraph shall not apply if paragraph (2) applies.

Excise Tax Technical Changes Act of 1958, Pub.L. No. 85–859, § 115, 72 Stat. 1275, 1279 (codified as amended at 26 U.S.C. § 4216(b)(1)). This amendment made certain that manufacturers selling at retail who did not qualify under the special rule (as Strick does not) were nonetheless taxed on a constructive *wholesale* price. 1958 Senate Report, *reprinted in* 1958 U.S.Code Cong. & Ad.News 4395, 4418.

This review of the genesis and evolution of section 4216(b) demonstrates that the purpose against which the reasonableness of the cost-floor alternative must be measured is the effort to approximate a wholesale price for a manufacturer selling only at retail. So viewed, the cost-floor alternative makes the reasonable assumption that a manufacturer will set his wholesale price to recover at least his cost of production. *See Technicolor Motion Picture Corp. v. Westover,* 202 F.2d 224 (9th Cir.1953); *Whattoff,* 355 F.2d at 478. To conclude otherwise would require a finding that it is a general practice for manufacturers to sell below their cost. There is no evidence in the record to support any such conclusion and such a result would clearly be beyond common dealings in the business world. Moreover, the early drafters of the constructive price provision clearly contemplated the possibility of a cost-based method of arriving at the constructive price. Thus, the 1932 House Report stated:

> This (constructive wholesale) price may be established with respect to any particular sale or class of sales, for example, by existing wholesale prices, or by a system of discounts from retail prices, or by a building up from cost of production, whichever method may be the most practical.

1939–1 C.B. (Part 2) 457, 480. The appropriateness of a cost-based constructive price is also mentioned in this report in connection with the special situation of gas and electric companies. 1932 House Report, 1939–1 C.B. (Part 2) 457, 484. Therefore, it appears, at least on a preliminary basis, that the administratively developed cost-floor alternative harmonizes with the origin and purpose of the statute. *National Muffler Dealers,* 440 U.S. at 477, 99 S.Ct. at 1307.

This conclusion is reinforced by consideration of other factors set forth in *National Muffler Dealers.* For example, although not promulgated simultaneously with either the Revenue Act of 1932 or the Internal Revenue Code of 1939, Revenue Ruling 54–61 was issued concurrently with the major revisions to the taxing statutes which occurred in 1954. It is unlikely that the ruling was issued casually or without careful study of the 1932 legislative history. The regulation had been in effect for almost twenty-five years when it was rejected by Congress in 1978. It may be assumed that substantial reliance was placed on it by the IRS and taxpayers alike during that time, since it contained the only specific guide to actually computing the excise tax payable by manufacturers of vehicles who sold at retail. The consistency and deliberateness with which the Commissioner promulgated the cost-floor alternative is also demonstrated by other revenue rulings issued between 1954 and 1978. *See, e.g.,* Rev.Rul. 68–519, 1968–2 C.B. 513; Rev.Rul. 68–202, 1968–1 C.B. 477. Finally, although the ruling was not specifically mentioned by Congress during the 1954–1978 period, it is not unreasonable to assume that Congress became aware of the ruling during the general scrutiny given to the constructive sales price provision in 1958, if not before. Congress did not disapprove the cost-floor method of calculation in the 1958 amendments but rather reaffirmed the Secretary's discretionary authority to determine a fair constructive price. Thus, the sentence added to section 4216(b)(1) provided that in the case of retail sales, excise tax would be computed on the lower of "(i) the price for

which such article is sold, or (ii) the highest price for which such articles are sold to wholesale distributors, in the ordinary course of trade, by manufacturers or producers thereof, *as determined by the Secretary.*" Excise Tax Technical Changes Act of 1958, Pub.L. No. 85–859, § 115, 72 Stat. 1275, 1279 (codified as amended 26 U.S.C. § 4216(b)(2) (emphasis added)).

Timing of issuance, durability, reliance, consistency of interpretation and degree of congressional scrutiny all support a conclusion that the cost-floor alternative was not contrary to the congressional mandate during the 1954–1978 period. *See National Muffler Dealers,* 440 U.S. at 477, 99 S.Ct. at 1307.

Strick argues, however, that the manufacturer whose costs are higher than 75% of the retail price of the product will pay a higher excise tax for the same product than the high profit margin manufacturer, *i.e.,* the one whose cost of production is 75% or less than the retail price. Strick contends that this result discriminates against the low-profit margin manufacturer and is contrary to the congressional intent that competitors within industries pay approximately the same amount of tax on the same product.

As can be seen from the legislative history discussed previously, Congress was concerned in both 1932 and 1958 about the uniform application of the excise tax. A similar concern is expressed in the legislative history accompanying the Excise, Estate, and Gift Tax Adjustment Act of 1970, Pub.L. 91–614, § 301, 84 Stat. 1836, 1844, which amended section 4216(b) in ways not relevant here. *See* S.Rep. No. 91–1444, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5689, 5708–10. The emphasis, however, was on the need for a constructive pricing system which would be tax neutral with respect to distribution systems. Congress was concerned with uniformity despite sales methods, not uniformity despite costs. The 1958 Senate Report also acknowledges that total uniformity was not possible even with respect to different distribution systems:

Your committee is in full agreement with the House that substantially different amounts of manufacturers' excise tax should not be imposed with respect to the same type of items merely because one manufacturer chooses to sell his article to a retailer or consumer while the other sells his to a wholesaler. It also recognizes that there are significant administrative problems which make it difficult to achieve a uniform base for purposes of the manufacturers' excise taxes. Therefore, your committee has adopted the constructive price provisions of the House bill.

1958 Senate Report, *reprinted in* 1958 U.S. Code Cong. & Ad.News 4395, 4415.

Moreover, in *Fitch Co. v. United States,* 323 U.S. 582, 65 S.Ct. 409, 89 L.Ed. 472 (1945), the Supreme Court rejected a similar attempt to bolster a discriminatory impact claim by reliance upon the same legislative history referred to here. In that case, a manufacturer of cosmetics subject to excise tax argued that advertising and selling expenses were "other charges" within the meaning of section 619(a) of the Revenue Act of 1932. That section excluded from the price upon which the tax was imposed, "[A] transportation, delivery, installation or other charge." One argument made by the taxpayer was that a failure to exclude the cost of advertising and selling expenses discriminated against the manufacturer who did his own selling and advertising and that this result was contrary to the legislative intent. *Id.* at 586–87, 65 S.Ct. at 411–12. Referring to the 1932 House Report, the Court rejected this argument, stating ". . . *Congressional statements relating to the desirability of eliminating discriminations against manufacturers making retail sales cannot be taken as evidence of a desire to prevent the natural inequalities that result when a tax is placed on the wholesale selling price.*" 323 U.S. at 588, 65 S.Ct. at 412. *Accord, Columbia Products Co. v. United States,* 404 F.Supp. 276, 281 (D.S.C.1975).

The two cases which have considered direct challenges to the cost-floor alternatives set forth in Revenue Ruling 54–61, *What-*

*toff v. United States,* 355 F.2d 473 (8th Cir.1966), and *Quaker City Iron Works, Inc. v. United States,* 256 F.Supp. 450 (E.D.Pa. 1966), are divided on the issue of its validity. The case law arising in related areas, however, generally supports a conclusion that the Commissioner properly exercised his statutorily granted administrative discretion in promulgating the cost-floor alternative.

In *Whattoff v. United States,* the operator of a franchised Studebaker dealership became subject to the manufacturer's excise tax when he began modifying Studebaker trucks to enable them to pull mobile homes. The taxpayer challenged use of the cost-floor alternative set forth in Revenue Ruling 54–61 to compute the amount of its liability. The Eighth Circuit rejected the challenge, stating: "Computation of the tax on a basis of the manufacturing cost is certainly reasonable as the fair market price of such manufactured articles is normally the manufacturer's cost plus a profit." 355 F.2d at 478. The court found that the challenged method of calculation "reflects a reasonable implementation of the statute and accompanying regulations." *Id.*

In the contrasting case of *Quaker City Iron v. United States,* the plaintiff taxpayer was a manufacturer of automobile bodies and truck and trailer bodies who sold at retail. During a six-year period, keen competition within the industry forced the taxpayer to offer his products at prices which ultimately resulted in operating losses for each of the six years. The taxpayer challenged imposition of the excise tax during the period based on the cost-floor alternative.[4] The district court stated:

It is a matter of common knowledge that the price for which articles are sold by a manufacturer is not necessarily higher than the cost of production. There are many instances where a manufacturer will sell items below cost for a considerable period of time in order to maintain his

markets or continue business operations in the hope that the market will ultimately swing in his favor.

256 F.Supp. at 453. The court held that: "When, . . ., the manufacturer lowers his retail price below cost so that, under Revenue Ruling 54–61, he is no longer paying tax upon substantially the same basis as his competitors, the ruling becomes inconsistent with the statute." *Id.* at 453–54. *Whattoff* was distinguished on the ground that there was no showing in that case that sales were made below cost and because there was no established wholesale price for the articles manufactured by the plaintiff in that case. *Id.* at 454. The court also rejected statements in the 1932 House Report to the effect that a constructive sales price might be derived "by a building up from cost." The court was of the opinion that this statement "clearly contemplates a situation where the sales price is above cost." *Id.* at 453 n. 7.

*Quaker City Iron Works* is factually distinguishable from the instant case in that Strick never actually lost money during the years in question. More fundamentally, however, *Whattoff* and analogous cases offer a more persuasive and carefully reasoned analysis of the issues and legislative history. *Quaker City Iron Works* stands almost alone in rejecting a cost-based method of calculating a constructive sales price. Other cases are generally in accord with the position and analysis set forth in *Whattoff.* See, e.g., *Boise National Leasing, Inc. v. United States,* 389 F.2d 633 (9th Cir.1968) (cost of truck bodies and component parts for taxpayer engaged in rebuilding trucks provides reasonable basis for constructive sales price for excise tax purposes); *Technicolor Motion Picture Corp. v. Westover,* 202 F.2d 224 (9th Cir.1953) (constructive sales price based solely on cost of photographic apparatus designed, manufactured and used by taxpayer approximated fair market

---

4. This is certainly the legal issue addressed and decided by the court. The court states, however, that the IRS, in reliance on Rev.R. 54–61, "refused to allow the plaintiff to use 75% of its retail price as a tax base" and "determined that

the plaintiff should pay the tax *based on its full retail price,* since 75% of retail price is lower than cost." 256 F.Supp. at 452–53. (Emphasis added).

price); *Callis-Thompson, Inc. v. United States,* 80–1 U.S.T.C. ¶ 16,335 (D.Del. March 31, 1980) (cost-plus basis for calculating constructive sales price as set forth in Rev.R. 68–202, 1968–1 C.B. 477, upheld on basis of legislative history, *Whattoff* and *Fitch* ); *see also Columbia Products Co. v. United States,* 404 F.Supp. 276, 280 (D.S.C.1975) ("... [D]iscrimination against one class of manufacturers or another as the direct result of a particular application of the excise laws is properly the concern of Congress, rather than the courts, ..."); *Continental Truck Industries, Inc. v. United States,* 343 F.Supp. 408 (E.D.N.Y.1972) (constructive sales price under § 4216(b) must approximate wholesale price; 75% of retail alternative set forth in Rev.R. 54–61 nullified by 1958 amendments but cost-based alternative sanctioned by legislative history and case law).

Based on the evolution of section 4216(b)(1), the legislative history and the relevant. case law, we conclude that the district court erred in invalidating the cost-floor alternative set forth in Revenue Ruling 54–61. The cost-floor method of calculation represents a reasonable approximation of a wholesale price and is therefore harmonious with the original purpose of section 4216(b)(1). The legislative history of the constructive sales provision indicates that cost-based methods of calculation were expressly contemplated by the drafters of the original provision. Until 1978, the method of calculation was consistently applied by the Commission for many years without any indication of congressional disapproval. A cost-based constructive wholesale price does impose a disparate economic burden on a high-cost manufacturer such as Strick. Obviously, the higher the relative cost or the wholesale price, the higher the tax. That undoubtedly affects the taxpayer's competitive position in a marketplace where competition keeps retail prices relatively uniform. But it is difficult to conceive of any tax that would not have that effect. The same argument could be made

against any sales tax: if one's product is higher priced than the competitor, any competitive disadvantage that results is exacerbated by the imposition of a tax based upon price. Ultimately, however, the sometimes harsh consequences of the method of calculation are due to "natural inequalities" which prevent any system of taxation from being truly uniform. *See Fitch Co. v. United States,* 323 U.S. at 588, 65 S.Ct. at 412. Congress itself recognized that absolute evenness of impact of excise taxes was administratively impossible to achieve. That Congress saw fit to alleviate in 1978 the burden placed on the high cost manufacturer by the cost-floor alternative does not mean that the Commissioner improperly exercised his discretionary authority at the time the Revenue Ruling 54–61 was promulgated. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960).

The decision of the court below is reversed.[5]

## II. THE TAXPAYER'S APPEAL—THE COTGO LEASING ISSUE

In the past, Strick has both leased and sold its products directly to ultimate users. In 1974, Strick's parent corporation, Distribution International Corporation, revived another of its subsidiaries, Cotgo Leasing Co. ("Cotgo") to assume financing and leasing responsibilities for the Strick trailers.

Under the new arrangement, Cotgo purchased the trailers or truck chassis from Strick with money obtained from various lenders under a revolving credit agreement. This agreement required that the price paid to Strick was to be equal to or not more than the price paid in an arms length transaction by a customer of similar size and credit rating. Cotgo then leased the trailers to customers and assigned the leases to the lenders as security for the loan. The

---

5. Because we determine that the taxpayer is not entitled to a refund, we do not reach the question of whether the taxpayer has complied with the anti-pass-along provisions of section 6416(a) of Title 26.

lenders also acquired a security interest in the leased trailers or chassis and in Cotgo's unleased inventory. Title of the vehicles passed from Strick to Cotgo and remained in Cotgo subject to the security interests of the lenders. The transfer of title was essential to the financing arrangement, since a principal reason for the use of Cotgo as the financing intermediary was to accommodate lenders by isolating the collateral from the claims of other creditors of Strick.

Cotgo has no separate employees, sales force or business location. The officers and managers of Strick handle the business operations of Cotgo, including the leasing of the trailers. Most of the directors of Strick are also directors of Cotgo. Advertising materials put out by Strick advises customers that they can either buy or rent trailers.

Section 4061(a) of the Code imposes a federal manufacturer's excise tax upon the sale of a truck chassis or trailer body. The lease of a trailer or chassis is regarded as a sale for purposes of imposition of the tax, but the manufacturer's liability for payment of the tax in a lease situation arises ratably as payments are made under the lease.[6] A manufacturer's liability also accrues ratably if the transaction is either an installment sale, a conditional sale or a chattel mortgage arrangement.[7] There is no dispute as to the amount of excise tax which Strick ultimately must pay in connection with the leasing of the trailers; the sole issue is whether the tax must be paid upon the sale or over the term of the lease as payments are received.

Strick argued before the district court that Cotgo should be disregarded as a corporate entity and that Strick should be regarded as the lessor of the trailers for purposes of accrual of excise tax liability. The district court held that Cotgo had insufficient economic substance to be recognized for excise tax purposes and that the transfer between Strick and Cotgo was not a sale. The court then held, however, that the transactions with the "lessees" should be regarded as sales for purposes of imposition of the excise tax. The court therefore denied the taxpayer's refund claim for credit.

Strick seeks a refund of $3,195,591, representing the amount of alleged overpayment of the excise tax, plus interest, during all calendar quarters of 1974 through 1978.

With respect to the question of Cotgo's economic substance, the issue to be determined is whether the rule of law set forth in *Moline Properties, Inc. v. Commissioner,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943), is applicable to the facts in this case.

Strick argues that the finding that Cotgo had insufficient economic substance is a factual finding that may not be overturned on appeal unless it is clearly erroneous. Fed.R.Civ.P. 52(a). The clearly erroneous standard of review does not control, however, when the issue is the applicability of the correct legal standard. *Commissioner v. Danielson,* 378 F.2d 771, 774 (3d Cir. 1967). If *Moline* applies, the factual finding of the district court was unnecessary.

---

**6.** Section 4217 of the Code provides in pertinent part:

(b) Limitation on tax.—In the case of any lease described in subsection (a) of an article taxable under this chapter, if the tax under this chapter is based on the price for which such articles are sold, there shall be paid on each lease payment with respect to such article a percentage of such payment equal to the rate of tax in effect on the date of such payment, until the total of the tax payments under such lease and any prior lease to which this subsection applies equals the total tax. 26 U.S.C. § 4217(b) (Supp. V 1981).

**7.** Section 4216(c) of the Code provides:

(c) Partial payments.—In the case of—

(1) a lease (other than a lease to which section 4217(b) applies),

(2) a contract for the sale of an article wherein it is provided that the price shall be paid by installments and title to the article sold does not pass until a future date notwithstanding partial payment by installments,

(3) a conditional sale, or

(4) a chattel mortgage arrangement wherein it is provided that the sales price shall be paid in installments, there shall be paid upon each payment with respect to the article a percentage of such payment equal to the rate of tax in effect on the date such payment is due. 26 U.S.C. § 4216(c) (1976).

The taxpayer in *Moline* was the sole shareholder of a corporation which owned real estate. Upon the sale of the property at a profit, the taxpayer sought to have the gain treated as income taxable to him as an individual. The Supreme Court rejected his claim, stating:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. (Citations omitted). In *Burnet v. Commonwealth Improvement Co.*, 287 U.S. 415 [53 S.Ct. 198, 77 L.Ed. 399], this Court appraised the relation between a corporation and its sole stockholder and held taxable to the corporation a profit on a sale to its stockholder. This was because the taxpayer had adopted the corporate form for purposes of his own. The choice of the advantage of incorporation to do business, it was held, required the acceptance of the tax disadvantages.

319 U.S. at 438–39, 63 S.Ct. at 1133–34 (Footnotes omitted). The continuing validity of the *Moline* doctrine in the income tax area has recently been affirmed by the Eighth and Tenth Circuits. *See Bennett Paper Corporation v. Commissioner*, 699 F.2d 450, 451–52 (8th Cir.1983); *Crouch v. United States*, 692 F.2d 97, 99 (10th Cir. 1982). *Accord, Collins v. United States*, 514 F.2d 1282 (5th Cir.1975), *aff'g per curiam*, 386 F.Supp. 17 (S.D.Ga.1974). No cases have been found which have applied *Moline* in the excise tax area.

It is undisputed that Cotgo was established as a separate corporate entity for substantial and legitimate business purposes. Cotgo provided a vehicle which made financing for the production of the trailers more obtainable by isolating the assets which would serve as security for the borrowing. Compliance with the demands of creditors was specifically named by the *Moline* court as one of the useful business purposes for which corporations are formed. 319 U.S. at 438, 63 S.Ct. at 1133. The existence of Cotgo insulated Strick from liability for the repayment of the loans made in connection therewith. Title to the trailers and truck chassis was transferred from Strick to Cotgo in return for full payment from Cotgo to Strick. The legal obligations imposed by the loan documents ran only from Cotgo, not from Strick. Strick did not guarantee payment of the loans. In addition to incurring an obligation for payment of the loans, Cotgo assumed other substantial responsibilities as a debtor under the revolving credit agreement, including the maintenance of a net worth in the minimum amount of $6,000,000 with a stockholders' equity in the minimum amount of $3,000,000. Cotgo entered into numerous leases as a lessor and received rental payments in connection therewith. These facts indicate that although Cotgo had no separate business location or staff, it functioned as a separate and distinct corporate entity in furtherance of a significant purpose which was the equivalent of "business activity."

Strick argues, however, that we should look to the substance of the transactions between Strick, Cotgo and the lessees rather than their form. Strick would have us conclude that, in effect, the trailers were being leased directly from Strick, and that Cotgo was merely being utilized as a conduit. In support of its position, Strick cites several cases and revenue rulings where an affiliated corporation in a position similar to that of Cotgo has been disregarded.

In most of these cases, use of the affiliated corporation conferred an excise tax saving on the manufacturer who was therefore arguing for recognition. In *Ayer Co. v. United States*, 38 F.Supp. 284 (Ct.Cl.1941), for example, the issue was whether sales by a manufacturer of cosmetics were "at retail" for purposes of applying the constructive sales provisions of the excise tax statute then in force. The manufacturing corporation formed a selling corporation to

handle the sales of its products. All of its inventory was transferred to the second corporation on credit for an amount equal to the cost of manufacture, plus 15%, plus the amount of the excise tax. The manufacturer sought to have the tax levied against this price, which was less than the constructive sales price that would have been imposed by the Commissioner. Because the selling corporation had no capital, no separate business location and shared employees, managers and directors with the manufacturing corporation, the Court of Claims found that the selling corporation was a mere shell. 38 F.Supp. at 288. The court held that sales to the public by the selling corporation would be regarded as retail sales by the manufacturing corporation and that the constructive sale price provisions of the Commissioner would apply. *Id.*

In *Kin-Septic v. United States,* 64 F.Supp. 142 (Ct.Cl.1946), the owner of a cosmetics manufacturing corporation set up a distributing corporation which assumed responsibility for the packaging, shipment and sale of the manufacturer's products. The manufacturer sought to have the tax assessed against the price it charged the affiliated corporation. Relying on *Ayer,* the Court of Claims found that "the primary purpose of the new arrangement was to reduce the amount of the tax" and imposed the tax payable by the manufacturer had it sold directly at retail. *Id.* at 148.

Most of the revenue rulings relied on by the taxpayer essentially replicate these holdings or involve minor variations. *See, e.g.,* Rev.Rul. 59–163, 1969–1 C.B. 353; Rev. Rul. 62–68, 1962–1 C.B. 216, Rev.Rul. 75–130, 1975–1 C.B. 347.[8] In each of these cases and rulings, the finding that no sale had occurred between the manufacturer and the distributing corporation was a necessary preliminary to the imposition of tax liability on the manufacturer on the basis of

a constructive sales price. For the most part, the holdings of these authorities are consistent with the recognized exception to the *Moline* rule that the Commissioner may disregard the corporate form in order to avoid a fraud on the taxing statute. *Moline Properties,* 319 U.S. at 439, 63 S.Ct. at 1134. Here the issue is whether the manufacturer should be taxed all at once or ratably.

Rev. Ruling 59–299, 1959–2 C.B. 253 provides the strongest support for Strick's position. In this ruling, the IRS considered transfers between a company which manufactured trailers taxable under section 4061(a) and a leasing company where (1) both companies were owned and operated by the same individual and where (2) both companies were owned by the same partners. It held that the transfers were not sales but that the manufacturer would be liable for excise tax upon lease of the trailers. This ruling is not cluttered by considerations of shifting functions in an effort to lower the tax. Rev.Ruling 59–299 is distinguishable, however, because in the one case the companies were sole proprietorships operated by the same individual and in the second case, the companies were operated by partnerships with common partners holding identical interests in both. The ruling is expressly grounded on the principle that "a person may not sell to himself." In the present instance, the affiliated entities and the common parent are all corporations which are generally recognized as separate taxable entities. *See Moline Properties,* 319 U.S. at 438–39, 63 S.Ct. at 1133–34.

Strick argues that the revenue rulings upon which it relies indicate that a practical and a flexible view of corporate structures prevails in the excise tax area. We are convinced, however, that results reached in these authorities further the congressional purpose of preventing manufacturers from avoiding constructive sales price provisions by selling to the ultimate consumer through

---

**8.** Rev. Ruling 67–209, 1967–1 C.B. 297, also relied on by the taxpayer, held that where the subsidiary of a foreign manufacturer of goods transmitted orders and received goods through an independent corporation which cleared the goods through customs, the substance over form rule would be applied to hold the subsidiary, and not the independent corporation, liable for excise taxes imposed upon an importer of goods. The issues and relationships discussed in this ruling do not illuminate the present problem before the court.

a related corporation or from reducing their excise tax liability by charging lower prices to related buyers. *See Creme Manufacturing Co. v. United States,* 492 F.2d 515, 519 n. 4 (5th Cir.1974); Rev. Ruling 62–68, 1962–1 C.B. 216. None of the cases or other authorities relied on by Strick considered issues related to the timing of a manufacturer's excise tax liability when a related corporation is used to assume financing obligations.

The position of the government is essentially that the *taxpayer* may not have a legitimately established corporation disregarded in order to obtain a tax advantage. In addition to relying on *Moline,* the government points out that this court recognized the appropriateness of a similar double standard in *Commissioner v. Danielson.* In that case, a taxpayer appealed the tax consequences of a contractual allocation of the purchase price of a business. We commented:

> Next, we are not here involved with a situation where the Commissioner is attacking the transaction in the form selected by the parties, *e.g., Schulz v. C.I.R.,* 294 F.2d 52 (9th Cir.1961). Where the Commissioner attacks the formal agreement the Court involved is required to examine the "substance" and not merely the "form" of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. *Gregory v. Helvering,* 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); *C.I.R. v. Court Holding Co.,* 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In contrast, the Commissioner here is attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties. And to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make.

378 F.2d at 774–75. Underlying the decision in *Danielson,* however, were policy considerations such as the desire to avoid a unilateral reformation of a contract, possible unjust enrichment of one of the parties to the contract and a concern for predictability in allocating the tax consequences in the sale of a business. *See Sullivan v. United States,* 618 F.2d 1001, 1004 (3d Cir. 1980). These policy considerations are not present here.

The Second Circuit has taken the position in reviewing organizational patterns chosen by corporate families that "whether probing form for substance leads to a decision favorable to the Government or to the taxpayer is immaterial. . . ." *Hoffman Motors Corporation v. United States,* 473 F.2d 254, 257 (2d Cir.1973). *See also Cleary v. United States,* 232 F.Supp. 828, 830 (W.D.Pa.1964).

We conclude, however, that in this case the taxpayer should be bound by the form in which it has chosen to conduct its business. Substantially all of the authorities relied on by Strick involved an attempt to avoid taxes, in effect, finding that the arrangement on paper was a sham and should not be utilized to avoid the normal tax consequences of the transaction. Here, having chosen to do business as separate entities, certainly Strick and Cotgo should be estopped from contending that their relationship was a sham and that they should be treated as one and the same. The taxpayer cannot now claim that it is entitled to all of the benefits but not the normal tax detriments that flow therefrom. *See Bennett Paper Corporation,* 699 F.2d at 451–52.

The circumstances which permit the Internal Revenue Service to look to the substance rather than the form of a transaction in order to seek payment of taxes which would otherwise be due but for the form, does not require the mutuality that Strick contends. The government has the right to claim that the form of a transaction should not be utilized to postpone taxes that are otherwise due. The taxpayer does not have the like right to contend that the form that it has chosen should be ignored so that avoidance or postponement of the tax can be accomplished. No such mutuality of remedy is or should be required.

Even if we were to accept the taxpayer's invitation to focus on the substance of the relationships here rather than the form, the substance of the corporate structure and financing arrangements entered into by Strick and Cotgo allowed Strick to receive the benefit of financing its manufacturing operations with borrowed money without incurring any of the obligations normally incident to such borrowing. The obligations for which the trailers were security were the responsibility of Cotgo alone. Strick's argument that it was in effect the borrower flies in the face of the legal import of the loan documents which obligate only Cotgo. "[A] transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." *Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974). In return for full payment, Strick transferred title and control. Thus, even if the court accepts the substance over form argument of Strick, these facts indicate that the separation between the two corporations and the transfers between them had significant economic consequences and were not merely a matter of form.

The full payment received by Strick when it transferred title to Cotgo is crucial in another respect. If we view the subsequent leases as the only operative transaction, Strick's liability will arise only ratably. 26 U.S.C. § 4217(b). Strick would thus receive a bonanza through a combination of full payment and deferred taxation. Although we have found no legislative history or cases which discuss the purpose of the deferred payment provision, the apparent purpose was to alleviate a cash flow hardship for the manufacturer, not to confer a windfall.

There is no dispute in the record that Cotgo was established to facilitate the financing of production of the Strick vehicles. The district court so found. Organizing one's business in order to comply with the requirements of lenders is a legitimate business purpose under *Moline.* 319 U.S. at 438,

63 S.Ct. at 1133. There is also no dispute that Cotgo engaged in business activity in furtherance of the purpose for which it was established. We find therefore that *Moline* is applicable to the facts of this case and that Cotgo must be recognized as a separate entity for excise tax purposes. We are not bound by the factual determination of the district court that Cotgo had insufficient economic substance to be recognized for excise tax purposes because the district court failed to apply the applicable legal standard. *Commissioner v. Danielson,* 378 F.2d at 774. We conclude that the sale of the truck and trailer chassis to Cotgo was the taxable event under section 4061(a). Strick's liability for payment of the manufacturer's excise tax arose in full at that time. Because the taxpayer paid the tax on this basis originally, the denial of the court below of the taxpayer's refund claim will be affirmed.[9]

For the foregoing reasons, the portion of the judgment from which the taxpayer appeals will be affirmed, and the portion of the judgment from which the government appeals will be reversed.

---

9. Because we determine that the liability of Strick for excise taxes must be decided on the basis of the first transfer of vehicles between

Strick and Cotgo, we do not reach the issue of whether the district court erred in recharacterizing the transactions with the lessees as sales.