**RUAN FINANCIAL CORPORATION, Ruan Transport Corporation, Appellees,**

v.

**UNITED STATES of America, Appellant.**

No. 91–3246.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1992.

Decided Sept. 29, 1992.

Seth O. Heald, Washington, D.C., argued (Shirley D. Peterson, Gary R. Allen, Robert S. Pomerance, on the brief), for appellant.

Mark McCormick, Des Moines, Iowa, argued (Keith Martin, Washington, D.C., on the brief), for appellees.

Before JOHN R. GIBSON, BEAM, and MORRIS SHEPPARD ARNOLD,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

The question before us is whether Ruan Financial Corporation and Ruan Transport Corporation engaged in rebuilding and thus "manufacture" of highway tractors and

---

* The HONORABLE MORRIS SHEPPARD ARNOLD was United States District Judge for the Western District of Arkansas at the time this case was submitted and was appointed Circuit Judge of the United States Court of Appeals for the Eighth Circuit on June 1, 1992.

was thereby subject to manufacturing excise taxes under 26 U.S.C. § 4051 (1988) and 26 U.S.C. § 4061(a)(1) (1982) (repealed 1984). The district court[1] held that Ruan's reconditioning activities fell short of "rebuilding", and were not taxable under the statute. *Ruan Financial Corp. v. United States*, 765 F.Supp. 985 (S.D.Iowa 1990). The United States appeals. We affirm.

Ruan was in the business of leasing new highway tractors (used to pull tractors or semi trailers) to businesses for five year terms. At the end of the five year lease, it customarily either sold the used tractors or placed them in a daily rental fleet. Because of a depressed market for used tractors in 1981 Ruan started a program designed to improve the tractors so that they could be leased for an additional three to four years. The program began in a shop in Corydon, Iowa. There Ruan disassembled the tractor down to frame rails, replaced or rebuilt all worn out parts and many parts that were not worn out, and then reassembled the tractor. The majority of the replacement parts were new rather than rebuilt. Ruan completely rebuilt every transmission and rear axle and replaced all clutches and U-joints. Ruan replaced the tractors' engines. Ruan also replaced, repaired or strengthened sheet metal where necessary and installed new electrical switches and instruments. Cabin interiors were completely refurbished. Ruan turned or replaced brake drums if they were scored, and gave the entire vehicle a fresh coat of paint. The doors were completely rebuilt. Ruan painted the cab interiors, and installed new seats, headliner, and carpeting. The dash was inspected, instruments tested and all wiring modifications completed.[2]

The goal of the program was to anticipate repairs that would be needed over the next three years. After it became clear that the tractors that went through the

program in the early days were not meeting that goal, Ruan stepped up the program and began spending more money on each tractor. Whereas Ruan spent as little as $10,000 on tractors going through the program in 1981, it was spending more than $20,000 in January 1983. By the end of the program in 1985, it was spending $30,000–$50,000 per tractor. Upon entering the program the tractors had a value of about $10,000 according to Ruan, or about $7,000, according to the government.

Ruan also began marketing the program as "Generation II." In some of its releases, it characterized Generation II tractors as being given "a second life" or being "born again." Ruan advertised that a Generation II tractor "sounds new, smells new, looks new, steers like new, brakes like new and rides like a new vehicle." One release said, "what emerges from our 'reassembly' line is a new truck—new where it needs to be." Ruan referred to the process as "rebuilding" or "remanufacturing" in internal company documents and promotional materials released to the public.

To facilitate financing of the Generation II tractors, Ruan tried to obtain new Vehicle Identification Numbers (VINs) from the Iowa Department of Transportation, but the Department advised that this would not be possible under existing law. In 1983, at Ruan's urging, the Iowa General Assembly enacted Iowa Code Ann. § 321.1.83 (West 1985), which authorized the granting of new VINs to the Ruan tractors as "remanufactured" vehicles.

Of the 426 tractors that went through the Generation II process, Ruan succeeded in leasing 243, placing the remainder in its daily rental fleet, a less desirable outcome because rental revenue depends on daily demand. Ruan sold some of the tractors three to four years later for prices equivalent to other used tractors of the same age

---

1. The Honorable Harold D. Vietor, Chief Judge, United States District Court for the Southern District of Iowa.

2. The district court order stated that parts that were removed and rebuilt or cleaned were returned to the same chassis with no interchanging of parts between tractors. 765 F.Supp. at

988. Because parts were not interchanged between tractors, the salvaged parts being returned to the same cab and chassis from which they came, and because the main structural components of the cab and chassis remained intact, the tractors remained identifiable throughout the process. *Id.*

which had not undergone the Generation II process.

The Internal Revenue Service assessed manufacturer's excise taxes on the tractors, relying on 26 U.S.C. § 4061(a)(1)[3] for tractors reconditioned up through March 1983 and 26 U.S.C. § 4051[4] for tractors that went through the process after April 1, 1983. Ruan paid the tax on twelve of 426 affected tractors and filed suit for refund of the taxes, and the government counterclaimed for the balance due on the assessment on the other 414 tractors. Ruan moved for summary judgment on the ground that the Generation II process did not constitute "manufacture" and therefore no excise taxes could be assessed. The government also moved for summary judgment.

The district court denied the government's motion for summary judgment and granted partial summary judgment for Ruan. *Ruan Financial Corp. v. United States*, 765 F.Supp. 985 (S.D.Iowa 1990).

The district court outlined the applicable law as follows:

Although the [Internal Revenue] Code does not define the term "manufacture", Treasury regulation 48.0–2(a)(4)(i) [26 C.F.R. 48.0–2(a)(4)(i) (1991) ] states:

The term manufacturer includes any person who produces a taxable article from scrap, salvage, or junk material, or from new or raw material, by processing, manipulating, or changing the form of an article, or by combining or assembling two or more articles into a new article.

Court decisions and IRS rulings have found "manufacture" in a number of situations: (1) when the combining or assembling of parts is so extensive that one brings about the production of a new or different article; (2) when one changes the form of an article; (3) when one rehabilitates an article that was of scrap or salvage value; and (4) when one rebuilds, as opposed to reconditions, an article.

765 F.Supp. at 987–88.[5]

The court stated that "the focus of any definition of manufacture must be the creation of a newly-identifiable article." *Id.* at 991. The court applied the four tests to the facts before it. The court determined that Ruan had not changed the form of the tractors, and did not assemble two or more articles to produce a new article. *Id.* at 988–89. The court held that the "rebuild-

**3.** 26 U.S.C. § 4061(a)(1) (repealed as of the end of March, 1983) provided:

> There is hereby imposed upon the following articles (including in each case parts or accessories therefor sold on or in connection therewith or with the sale thereof) sold by the manufacturer, producer, or importer a tax of 10 percent of the price for which so sold, except that on and after October 1, 1984, the rate shall be 5 percent—
>
> .     .     .     .     .
>
> Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.

**4.** 26 U.S.C. § 4051(a)(1)(E) (effective April 1, 1983) imposes a higher tax at the time of the first retail sale:

> There is hereby imposed on the first retail sale of the following articles (including in each case parts or accessories sold on or in connection therewith or with the sale thereof) a tax of 12 percent of the amount for which the article is so sold:
>
> .     .     .     .     .
>
> (E) Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.

"First retail sale" was defined as the first sale "after production, manufacture, or importation." 26 U.S.C. § 4052(a)(1) (1988). Under 26 U.S.C. § 4217(a) (1988) and 26 U.S.C. § 4218(a) (1988), a lease or other use by the manufacturer constitutes a sale.

**5.** The question before us would be quite straightforward had the Generation II program taken place today instead of in the early 1980's. H.R.Conf.Rep. No. 1104, 100th Cong., 2d Sess. 178 (1988), reprinted in 1988 U.S.C.C.A.N. 5048, 5238, the Conference Report on the Technical and Miscellaneous Revenue Act of 1988, describes a safe harbor for reconditioning that results in an article worth less than 75 percent of the price of a new truck. The Treasury published a revenue ruling in 1991 adopting the 75% test for transactions after November 9, 1988. Rev.Rul. 91–27, 1991–15 I.R.B. 26. The parties agree that the safe harbor does not apply retroactively to activities in the time period in this case.

ing" test is redundant of the other tests and that at any rate there is a distinction between rebuilding and reconditioning (which the district court concluded is not taxable under analogous regulations, 26 C.F.R. § 48.4061(b)–3(a) (1991)) and that the Generation II process was reconditioning. 765 F.Supp. at 990. In considering whether Ruan had rehabilitated an item of scrap value, the court stated that it was not clear whether the Generation II tractors had been scrap material before entering the program. *Id.* at 989. Accordingly, the court denied the government's summary judgment motion and denied Ruan's motion only insofar as it was unclear whether the tractors entered the program as scrap. *Id.* at 991. Otherwise, the court entered summary judgment for Ruan. *Id.*

Ruan and the government stipulated as to which portion of the tractors were scrap, and the government appeals the order insofar as it applies to the trucks that entered the program in useable condition.

## I.

On appeal the government argues that the Generation II process constitutes "rebuilding", *see* H.R.Rep. No. 945, 97th Cong., 2d Sess. 15 (1982) ("As under present law, the rebuilding of a truck will be treated as manufacture") and relies on *Boise National Leasing, Inc. v. United States,* 389 F.2d 633 (9th Cir.1968), and *United States v. Armature Rewinding Co.,* 124 F.2d 589 (8th Cir.1942), to give meaning to the term.

The government's argument has three strands. First, it argues that the Generation II process would be characterized in the industry as "rebuilding," citing the testimony of experts in the highway tractor business. This argument need not detain us long, since as the district court noted, 765 F.Supp. at 989–90, the existence of "rebuilding" is not a test in its own right, but merely a way to describe the other tests for manufacturing. The authority from which the government draws its "rebuilding" argument is H.R.Rep. No. 945, which purported only to summarize existing law. Therefore, unless the government

can satisfy the criteria existing prior to H.R.Rep. No. 945, mere testimony that the Generation II process amounted to "rebuilding" is not determinative.

Second, the government argues that the district court did not correctly interpret *Boise,* a case in which the use of "glider kits" (basically, new cabs and frames often used to rehabilitate wrecked tractors) was held to be "manufacturing" new tractors. In the government's reading, *Boise* would characterize as "manufacture" not only production of useable items from scrap, but also production of items useable in Ruan's business from items which have lost their usefulness *to Ruan.* The government argues that though still in useable condition, "[t]he tractors had exhausted all or most of their useful lives *in Ruan's business,* since Ruan's customers leased vehicles in mint condition whose 'downtime' while in the shop for repairs would be minimal." (emphasis added). We reject the idea that whether the Generation II process resulted in a taxable event hinged not on whether the tractors still had some useful life without undergoing the process, but on whether they were useful to Ruan. Such a test could result in an unpredictable state of the law in which the same actions would be manufacturing in some cases and not in others, depending on the nature of the taxpayer's business. This is not a rational distinction.

The district court correctly recognized the underlying principles of *Boise* that there must be some process resulting in a change of entity to constitute "manufacture", as opposed to mere restoration of the utility of the existing trucks. 389 F.2d at 636. The district court did not err on the undisputed facts before us in holding that what occurred was the reconditioning and putting together again of the previous structures and entities with incidental replacement, a situation explicitly distinguished in *Boise. See* 389 F.2d at 636. The district court decision gave full recognition to *Boise,* interpreted it correctly, and on the undisputed facts before it reached the contrary conclusion from that reached in *Boise.* It did not err in doing so.

**456**

Third, the government argues that under *Armature Rewinding,* the proper test should be whether the Generation II process was intended to produce tractors that would compete in the marketplace with new tractors. The government argues that it was indisputably Ruan's intent to compete with new tractors, as seen from its advertising copy touting the Generation II tractor as "born again," "new where it needs to be," "actually *better* than new," etc. We reject this argument for two reasons. First, *Armature Rewinding* is distinguishable from this case because it involved use of auto parts that were made from *scrap* material. This is a sufficient basis for its holding, and differentiates *Armature Rewinding* from the present case, in which the tractors at issue were concededly not scrap. Second, the evidence shows that Ruan did not try to pit its Generation II tractors against new tractors, since Ruan leased its new tractors for five years but only tried to lease the Generation II tractors for three to four years. In light of these distinctions it is not necessary for us to address the debatable point of whether the government's intended to-compete-with-new test is workable or a supportable interpretation of existing law.

The district court did not err in holding, on the undisputed facts, that the Generation II program was a reconditioning as opposed to a manufacture or rebuilding, and thus was not subject to the excise tax.

## II.

The government argues in the alternative that if it is not entitled to judgment as a matter of law on the undisputed facts, at least we should remand for further proceedings. The shortcoming of this argument is that neither the government nor Ruan points to any unresolved issues of material fact, but rather both argue the case on the basis of the correctness of the district court's ruling, as a matter of law, on undisputed facts. While the government relies on Ruan's characterization of its process, in its promotional and other materials, as rebuilding or remanufacturing, there is no dispute between the parties concerning the nature of this process. This is determinative in deciding whether there was a "manufacture" within the meaning of the statute. No basis has been demonstrated for remanding the case to the district court for additional proceedings.

We affirm the judgment of the district court.