**BOISE NATIONAL LEASING, INC.,**
**Appellant,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 21331.**

United States Court of Appeals
Ninth Circuit.

Feb. 1, 1968.

R. B. Kading, Jr. (argued), of Richards, Haga & Eberle, Boise, Idaho, for appellant.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Jeanine Jacobs, Howard M. Koff (argued), Attys., Dept. of Justice, Washington, D. C., Sylvan A. Jeppesen, U. S. Atty., Boise, Idaho, for appellee.

Before JOHNSEN,* BARNES and ELY, Circuit Judges.

JOHNSEN, Senior Circuit Judge.

Taxpayer, Boise National Leasing, Inc., of Boise, Idaho, has appealed from the District Court's dismissal on the merits of its suit for refund of some manufacturer's excise taxes, § 4061(a), Int. Rev.Code of 1954, 26 U.S.C.A. § 4061(a). The tax amounts involved were $10,463.-19 for the year 1962 and $1,000.49 for the year 1964.

We agree with the trial court's findings and conclusions, 257 F.Supp. 614, except as to the correctness of the computations or amounts of the taxes involved. To enable the court to deal with this aspect, as later discussed, the judgment will be vacated and the case remanded.

---

* Harvey M. Johnsen, Senior Circuit Judge of the Eighth Circuit, sitting by designation.

Taxpayer's contentions here are in general, as they were in the court below, (1) that no manufacture had occurred as a basis for the excise taxes imposed; (2) that if a manufacture was involved then another and not it had to be held to be the manufacturer; and (3) that the taxes imposed were in any event incorrect in their computations or amounts.

Taxpayer was engaged in the business of leasing equipment. The excise taxes were imposed in relation to a reconstruction of six used White logging trucks, which taxpayer had done in 1962, and to a reconstruction of a used Sterling truck, which it had done in 1964. The trucks were reconstructed for use by taxpayer in its leasing business.

The basis on which the Internal Revenue Service imposed the taxes was that the extent and nature of what had been done created in each instance a new vehicular article, so that the reconstruction was on its elements, processes and results a production or manufacture of trucks; that while taxpayer had had the reconstruction contractually done by another party, it had furnished major materials or components therefor and retained title thereto, so that, under § 316.4 of Treasury Regulations 46 (1940 ed.), it was entitled to be considered, for excise tax purposes, the manufacturer of the trucks; and that as a manufacturer its use in its own business of a truck produced by it, instead of making a sale thereof, was under I.R.C.1954 § 4218(a), as amended, 26 U.S.C.A. § 4218(a), made subject to the excise tax of § 4061 "in the same manner as if such article were sold by [it]".

As to the six White trucks, these were bought by taxpayer from a lumber mill in 1962 for $53,700 (in round numbers), or an admitted price of $8,950 each. They were purchased with the intention of having them reconstructed and added to taxpayer's leasing equipment. Taxpayer contracted for the reconstruction to be done by Kenworth Motor Truck Co., of Seattle, Washington, at a price of $6,900 for each truck. We agree with the District Court that what was done

constituted on its form, substance, and result, not a repairing or reconditioning of the old truck structures or entities with an incidental replacement of some existing part or parts thereof, but the creating of other structural assemblies and functional entities.

Kenworth was to make new steel frames of certain specification and to combine and coordinate thereon certain components from the old truck and certain other components to be supplied by it. The old trucks as such were not to come into Kenworth's hands. As related to Kenworth's undertaking, these had ceased to have any identity as truck structures or entities. Taxpayer had had them completely dismantled immediately after their purchase. As noted, Kenworth was merely to be furnished with certain of the then-separated components; it was to provide other specified components necessary to make a completed truck; and all these elements were to be combined and coordinated by it, on the frame which it was to make, into an operable truck unit.

The specification contained in the contracts of the individual elements involved serves to emphasize the nature of what Kenworth was to do and the result which would be effected thereby. Detailing in terms of the specification, Kenworth was first of all to construct new truck frames. It was to provide and add to this basic element new cabs, radiators, steering gears, front axles, complete brake systems, electrical systems, instrument assemblies, fuel tanks, and other minor elements and accessories. Taxpayer was to furnish, for incorporation into the assemblies, the engines, generators, starters, compressors, transmissions, clutches, rear axles, Timken spring suspensions, inter-axle drive lines, ten wheels and tires, and a few other specified minor elements from the old trucks. Both the elements which taxpayer was to furnish and those which Kenworth was to provide went into effecting the complete entities by regular assembly line processes, as used by Kenworth in its general business, which was the building of trucks to order.

To us it seems clear that such form of construction, such type of process, and such change in entity were involved as to constitute in the situation a production or manufacture of trucks, and not a restoration of the existence and utility of the previous trucks. The old trucks had been permanently stripped of all their form, all their identity, and all their utility as vehicular structures and entities. It might incidentally be interjected, however, that this, of course, is not to say that there cannot occur a dismantling of an old truck, with a repairing, reconditioning, replacing of some parts, and a reassembling of the truck elements, such as not to constitute the manufacturing of another truck.

But what was here done was hardly a disassembling, reconditioning and putting together again of the previous structures and entities, with incidental replacements. The dismantling had as its very purpose the permanent severance from the old truck structures and entities of some of the major components thereof and the incorporation of them as elements in other structures which were to be assembled. Further, these created structures involved such number and significance of new truck elements that neither vehicular form nor vehicular utility could have come to exist without their assembly addition.

Thus, the old truck components had in the situation no different status and relationship than if taxpayer had bought them independently and not in joinder to or as part of the old truck structures. Indeed, on the stipulation in the record, the obtaining of these components for use as elements in the truck structures and entities which Kenworth was to create constituted the only value which the purchase of the used trucks had or was apparently contemplated as being able to have to taxpayer. Taxpayer stipulated that there was no salvage from the dismantling of the old trucks to reduce the purchase price of $8,950 each which it had paid for them. Hence what taxpayer must have desired to obtain, and all that it did obtain by the purchase, was the motors, transmissions, etc., of the used trucks in the value which these could have as components or parts of the structures and entities which Kenworth was to create.

We can accordingly see no need for any further discussion as to a manufacture of truck structures and entities having been involved, and not a repairing, reconditioning and restoring of the old White trucks as purchased by taxpayer. Elements for which taxpayer had been willing to pay $8,950 in dismantling obtainment were to be incorporated by Kenworth into a structural assembly with such new additional substantial elements as were necessary to create a truck entity, at a price to taxpayer of $6,900 for the new elements and the assembling processes required to effect that result. And the result was, of course, no less a manufacture than if the created entity had been made to consist wholly of new elements or materials. Under § 316.4 of Treasury Regulations 46, the producing of a taxable article "from scrap, salvage or junk material * * * (1) by processing, manipulating or changing the form of an article, or (2) by combining or assembling two or more articles" is manufacturing equally with the producing of such an article "from new or raw material".

What has been said as to the six White trucks has application also to what taxpayer had done to the Sterling used truck in 1964. So far as it is possible to tell from the record, this truck was similarly converted into another structure and entity, with a use of the Sterling engine, transmission, etc., as components, just as in the case of the White trucks. The record in any event provides no basis for any distinction to be regarded as existing in this respect between the two situations. The only difference which is made to appear is that in the case of the Sterling truck, instead of having Kenworth do the assembling of the old truck elements and the new elements necessary to be provided to create a truck entity, taxpayer purchased from Kenworth, in packaged or "glider kit" form, all the

necessary new elements, including frame, cab, brake system, etc., for a price of $6,478, and then had the structuring and assembling processes done by a third party. But this would not make the result any different as to a new truck entity having been produced, and not a repairing or reconditioning of the old truck structure having been effected, so that no less than in the case of the White trucks was there a manufacture involved as to the Sterling truck.

Taxpayer's next contention is, as previously mentioned, that if a truck manufacture was involved in the situation, then Kenworth and not it had to be regarded as the manufacturer.

The provision of § 316.4 of Treasury Regulations 46 has been referred to above, that " * * * where a person manufactures or produces a taxable article for a person who furnishes materials and retains title thereto, the person for whom the taxable article is manufactured or produced, and not the person who actually manufactures or produces it, will be considered the manufacturer". The reason for this provision seems obvious in the tax confusions and complications to which situations of this character could otherwise give rise.

 Even as to the situation here, taxpayer argues that, notwithstanding its retention of title to the White truck components used, Kenworth had such a proprietary interest in the article produced as legally to make it the owner thereof and so to constitute taxpayer simply as a purchaser of Kenworth's interest. The District Court held that Kenworth "was merely a fabricator who had neither a proprietary interest in the completed vehicles nor right to their sale or use; Kenworth was only entitled to reimbursement for the services of fabrication". We agree with this conclusion.

There was no contract provision by which taxpayer, either expressly or impliedly, released or subordinated to Kenworth its title to the $8,950 components which it furnished, so that Kenworth might have an unclouded $6,900 title-hold upon the manufactured truck. Nor was there any provision by which Kenworth sought to retain title to the components which it was to supply as related to its turning over to taxpayer the completed trucks. Kenworth was obligated under the contract to complete the truck and make delivery of it to taxpayer by a specified date. Taxpayer was merely to pay the agreed production price of the completed vehicle, and this was not required to be done until ten days after Kenworth had made delivery of the truck. Manifestly, as the trial court held, Kenworth thus had "neither · a proprietary interest in the completed vehicles nor right to their sale or use".

It is therefore not necessary to determine here whether the fact that taxpayer had furnished materials from the old trucks and retained title thereto would have been sufficient under § 316.4 of the regulations to impose liability upon it as manufacturer of the trucks, if Kenworth's contract had provided that title to the frame and the other elements which it was to supply was to remain in it, notwithstanding their incorporation into the general truck structure, until the agreed production or purchase price had been paid. Incident to this, however, it is perhaps not possible to escape notice that the language used in the regulation is "furnishes materials and retains title thereto", without any definition of the relative extent thereof; and, further, that the reported decisions speak generally of "a proprietary interest" in the article being produced as the basis for the right to impose taxes on one as its manufacturer, without indication of the necessary extent of such proprietary interest. See e. g. Vinal v. Peterson Mortuary, Inc., 8 Cir., 353 F.2d 814, 817; Charles Peckat Mfg. Co. v. Jarecki, 7 Cir., 196 F.2d 849, 852.

But whether it is possible, as to the manufacture of an article, for a taxpayer who furnishes materials therefor [*substantial* ? or *any* ?] and retains title thereto, as well as for the party who engages in the production process and also provides materials, to each have a several

proprietary interest in the completed article, so as to be capable of giving rise to some possible aspect of sale in respect to the liability for excise taxes is a problem which we need not here solve.

As to the Sterling truck, taxpayer's contention that there could be no excise tax liability against it is predicated on Revenue Ruling 210, 1963—2 Cum.Bull. 497, to the effect that glider kits used to repair or remodel damaged or outmoded automobile trucks are taxable parts and accessories, with the tax payable by the manufacturer thereof. But the fallacy of taxpayer's argument that this leaves it without liability for excise taxes as to the Sterling truck is that the glider kit involved was here, as we have stated, no more used to repair or remodel the old Sterling truck than were the components supplied by Kenworth as to the old White trucks. Further, in the incompleteness of the glider kit to make the entity which taxpayer had constructed, the purchase of the kit by taxpayer did not, of course, come within the provisions of § 316.4(c) of Treasury Regulations 46 that "A manufacturer who sells a taxable article in a knockeddown condition, but complete as to all component parts, is liable for the tax, and not the person who buys and assembles a taxable article from such component parts".

This leaves then as the only remaining aspect requiring consideration the question on which we indicated at the start that we deemed it necessary to vacate the trial court's judgment—the correctness of the computations or amounts of the taxes imposed.

One of the challenges made by the taxpayer as to the amount imposed in respect to the six reconstructed White trucks is against the fair market value determination used by the Internal Revenue Service as a basis for the taxes. This challenge, however, gives us no difficulty.

Under § 4218(e) of Int.Rev.Code 1954, 26 U.S.C.A. § 4218(e), taxpayer's status as a manufacturer of these reconstructed trucks, with a use of them in its business, made it liable for tax "computed on the price at which such or similar articles are sold, in the ordinary course of trade, by manufacturers * * thereof, as determined by the Secretary or his delegate". Section 316.7 of the regulations similarly provides that in such a situation "the tax will be computed on the basis of the fair market price of the article".

The Internal Revenue Service determined that the fair market value of the six reconstructed White trucks was $17,435 each (using here round numbers). As noted, these were not conventional trucks but specialized logging vehicles. The value determined by the Internal Revenue Service was reflective of the amount ($8,950) paid by taxpayer to obtain the components which it desired to have used from the old truck and the amount ($6,900) paid by it to Kenworth for construction of the new entity, with the addition of 10 percent thereto under Rev.Rul. 54–490, 1954—2 Cum. Bull. 416, as manufacturer's profit which would reasonably be attendant upon a sale.

■■ The price paid for an article in natural unremote sale can, of course, have probative competence on its general market value. United States v. Jones, 9 Cir., 176 F.2d 278, 286, Rudin v. Steinburger, 2 Cir., 103 F.2d 323, 324. See also 31A C.J.S. Evidence, § 183(2). While, as suggested in Vinal v. Peterson Mortuary, Inc., supra, 353 F.2d at 818–819, the District Court would perhaps not have been "compelled to determine as a fact that the ultimate figures presented ·by the Government represent the fair market value", it cannot be held that the court had no right to consider the price which taxpayer had paid for the reconstructed entities and to conclude that this, with the addition of the 10 percent profit element, fairly represented the amount for which the reconstructed trucks could have been sold to someone in need of such specialized vehicles, as was taxpayer.

■ Taxpayer was here suing for refund and so had the burden of proving that the value determination made by the

taxing authorities was erroneous as a basis for the taxes. Taxpayer offered no evidence as to the value of the trucks, except the general testimony of a single witness—of whom taxpayer was a customer—that the White trucks had a value of only $4,000 each at the time they were purchased by taxpayer and that the reconstructed trucks had a value of only $11,000 each. But this evidence was not of such compelling character or persuasive force that the court was required to regard it as overbalancing the weight of the price which taxpayer had paid.

The testimony could the more be regarded as unimpressive in that taxpayer did not see fit to admit and offer explanation of how it had made the gross mistake of paying $8,950 for trucks which its witness said could have been bought for $4,000 and had come to further compound this $30,000 error by putting in an additional $39,400, to wind up with six trucks at a cost of $15,850 each, which its witness said could have been purchased for $11,000 each. In considering the question of value, the court would be entitled to believe that there existed more reasonable indication of the possible reality involved—with a corroboration of the fairness of the Internal Revenue Service's value determination—in the witness' further testimony that a truck assembled, of the specifications involved, from all new elements, would have cost taxpayer "around $19,000", and in the circumstance that taxpayer had gotten such an entity as it apparently desired for its business at a cost of $15,850 (it had not expected to have to pay manufacturer's excise tax). This is sufficient comment as to the fairness in general of the market-value determination made in the situation.

■ Another challenge made by taxpayer against the amount of the taxes imposed was to the use of the 10 percent profit factor, under Rev.Rul. 54–490, 1954—2 Cum.Bull. 416, as an addition to its manufacturing or obtainment costs for tax-base purposes. The use of this factor has been previously approved by this Court in Technicolor Motion Picture Corp. v. Westover, 9 Cir., 202 F.2d 224, 229, where it was said:

"Since the price at which an article is normally sold in the ordinary course of trade is the manufacturing cost with an additional item of profit, a computation of the tax (where there is a use of the taxed article but no sale of it) which as here is based solely on the cost of construction of the article to the taxpayer is more than reasonable and is tantamount to a fair market price which the Regulations authorize the Commissioner to compute against the taxpayer."

Taxpayer argues that it was unreasonable in the situation to use this 10 percent factor because the Government was thereby being permitted to compound the profits which had been involved as to other parties in taxpayer's imputed manufacture of the trucks. Presumably White had made a manufacturer's profit in the original sale of the trucks. Presumably also Kenworth's price to taxpayer had included a profit on the reconstruction job done by it. Kenworth's profit had of course been paid by taxpayer as part of the price charged it for the reconstruction. White's profit may diffusedly have entered into the amount which taxpayer had to pay for the used trucks. But the matter of how taxpayer's cost may have come to be would not be of significance in the ultimate question of value, if what taxpayer paid was in fact the market value of what it had bought.

It would hardly seriously be asserted that if taxpayer had sold the trucks after their reconstruction, it would have reduced the profit factor which it sought to add to its costs by the amount of the profits of others which had entered into its manufacturing costs. This is as far as we need go in answer to taxpayer's attack upon the use of the 10 percent profit factor as related to the fair market price which would have been put upon the reconstructed trucks if taxpayer had sold them. Indeed, the length of our discussion is more than the contention merits.

■ Equally without merit is taxpayer's further contention that the $8,950 paid for each of the old White trucks to obtain the components for the new entities should have been excluded from the value basis on which the taxes were computed. Neither the language of the statute under which taxpayer's liability accrued nor that of the regulations affords basis for such an exclusion as to the tax base of the manufactured trucks. Whatever, if any, could have been the effect in the situation of the provisions of § 801(b) of the Excise Tax Reduction Act of 1965, 79 Stat. 136, 26 U.S.C.A. § 4216(g), if they had been in force at the time, is immaterial here for the legislative history of the section reflects no intention to affect "the tax base for such vehicles under prior law". See Sen. Rep.No. 324, Part V, Subd. 4, 1965, U.S. Code Cong. and Adm.News, pp. 1736–1737.

■ We reach finally then the matter on which we indicated at the start that we were vacating the trial court's judgment of dismissal to enable it to deal further with this single aspect of the situation. This relates to the failure of the Internal Revenue Service to have made any exclusion at all of other excise taxes involved in the situation for purposes of applying its 110 percent formula to taxpayer's cost in getting at fair market value within the price realities of trade competition.

The Government's brief contains the following statement and concession:

"It is the present position of the Commissioner of Internal Revenue that where a manufacturer-user purchases tax-paid parts which he uses in the manufacture of chassis or bodies, the tax so paid on such parts or accessories is to be excluded in computing his 'cost' for purposes of applying the 110 percent formula. This conclusion is based on the concept that in the ordinary course of trade a selling price will not reflect costs which would be avoided in a properly conducted business.

"Accordingly, the Government is in agreement that a remand should be made for recomputation of the tax 'to exclude excise tax from basis'."

Clearly, the tax paid by taxpayer on the glider kit purchased by it for use in reconstructing the Sterling truck falls within this category. Equally it seems to us does this concept logically and fairly call for exclusion from taxpayer's manufacturer-user tax basis of the taxes involved in Kenworth's reconstruction of the White trucks. Within the competitive price-reality on which the Commissioner's position is apparently predicated —"that in the ordinary course of trade a selling price will not reflect costs which would be avoided in a properly conducted business"—taxpayer could no more have made its trade selling price include the taxes involved in Kenworth's reconstruction of the White trucks than the taxes paid on the glider kit purchased for reconstruction of the Sterling truck.

The statute made taxpayer chargeable imputedly for the tax consequences of Kenworth's reconstruction or manufacturing operations. The Commissioner could not reasonably attempt to subject such an imputed manufacturer to greater taxes than those to which he was subjecting an actual manufacturer, either in form of tax base or otherwise. The taxes involved in Kenworth's operations were incidents of the imputed manufacturing in which the statute regarded taxpayer as having engaged. Actually the taxes were, of course, paid by taxpayer in the reimbursing embodiment of them contained in Kenworth's price. They were costs as to whose exclusion from the tax base there could have existed no question under the Commissioner's position, if taxpayer's contract with Kenworth had been made to provide that such purchases of elements as were necessary to be made to complete the trucks in the reconstruction job done were to be made as taxpayer's agent. They are, therefore, in the avoiding of tax discrimination, costs which in our opinion are entitled to be excluded from the tax base here under

the principle of the Commissioner's position.

What has been discussed has nothing to do with the question of refund of the taxes which have been paid upon any parts. It goes merely to the matter of the base upon which the manufacturer's tax against taxpayer should have been computed. The suit here is not one for refund of any taxes paid on parts as such but for refund of the manufacturer's tax paid on the market value of the reconstructed trucks. It may be noted that the record indicates that a statutory claim for refund as to the taxes paid by Kenworth has been made by it apparently for taxpayer's benefit, which claim is still pending administratively, but this is not of relevance here.

The rest of taxpayer's contentions we dispose of summarily as being without any merit.

The judgment is vacated and case is remanded for further proceedings in respect to, as herein indicated, the correctness of the tax base used and for the granting of any refund to which taxpayer may be entitled on that basis.