In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-3354

SCHNEIDER NATIONAL LEASING, INC.,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:17-cv-00672 — **William C. Griesbach**, *Judge.*

ARGUED MAY 13, 2021 — DECIDED AUGUST 25, 2021

Before SYKES, *Chief Judge*, and SCUDDER and KIRSCH, *Circuit Judges*.

SCUDDER, *Circuit Judge*. This appeal presents two questions of first impression concerning a federal excise tax on heavy trucks and the scope of a statutory safe harbor. The answer affects whether Schneider National Leasing, a large trucking company, can take advantage of the safe harbor for repairs and modifications, codified in 26 U.S.C. § 4052(f)(1), to avoid paying a 12% excise tax on 976 tractors it overhauled from

2011 to 2013. The district court held a bench trial, determined that the degree of refurbishing in question constituted the manufacture of new trucks rather than repairs or modifications, and therefore concluded the safe harbor did not apply. We see the application of the statutory language differently and reverse.

**I**

We begin with the statutory framework and then turn to whether Schneider National Leasing's overhaul of nearly 1,000 highway tractors fell within the safe harbor from the federal excise tax.

A

Congress has taxed the sale of trucks by manufacturers, producers, and importers for over 100 years. See War Revenue Act of 1917, Pub. L. No. 65–50, § 600(a), 40 Stat. 300, 316. The current iteration of this excise tax, enacted as part of the Highway Revenue Act of 1982, resides in 26 U.S.C. § 4051. See Pub. L. No. 97–424, § 512, 96 Stat. 2168, 2174–75. The statute imposes the excise tax in these terms:

> There is hereby imposed on the first retail sale of the following articles (including in each case parts or accessories sold on or in connection therewith or with the sale thereof) a tax of 12 percent of the amount for which the article is so sold:
>
> …
>
> (E) Tractors of the kind chiefly used for highway transportation in combination with a trailer or semitrailer.

26 U.S.C. § 4051(a)(1).

In a neighboring provision, § 4052, Congress provides definitions and rules that clarify the contours of the tax. Section 4052(a) defines "first retail sale" to mean "the first sale, for a purpose other than for resale or leasing in a long-term lease, after production, manufacture, or importation." *Id.* § 4052(a)(1). Congress likewise considered both the lease of an "article" by the manufacturer and the use of "an article taxable under section 4051 before the first retail sale" to constitute sales subject to the 12% tax. See *id.* § 4052(a)(2) (referencing 26 U.S.C. § 4217); § 4052(a)(3). The statute further makes plain that a highway semi-tractor qualifies as an "article." See *id.* § 4051(a)(1)(E).

What this all means in nontechnical terms is that a company that manufactures a big rig semi-tractor and then sells, leases, or uses the tractor, incurs a 12% tax on the first sale or lease. The IRS requires a company like the taxpayer here, Schneider National Leasing, to file a Form 720 on a quarterly basis to report any federal excise taxes due.

Front and center in this appeal is the safe harbor, also in § 4052, that Congress adopted in 1997 to permit companies to repair or modify tractors they already own (and which have already been taxed) without triggering the 12% excise tax anew. See Taxpayer Relief Act of 1997, Pub. L. No. 105–34, § 1434, 111 Stat. 788 (1997). This safe harbor provision—titled "Certain repairs and modifications not treated as manufacture"—provides:

> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a

functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1).

Notice how Congress drafted the safe harbor. Recall that the underlying excise tax applies to the "first retail sale" of an "article" like a tractor, which means "the first sale … after production, manufacture, or importation." *Id.* §§ 4051(a)(1), 4052(a)(1). The safe harbor establishes that some changes to a tractor do not qualify as "manufacture" or "production"—the consequence being that a company can lease, sell, or use that tractor without the transaction constituting a "first retail sale" because it has not occurred "after production, manufacture, or importation." *Id.* § 4052(a)(1); (f)(1). The 12% excise tax only applies to "the first retail sale," so without "manufacture" or "production," no tax liability is triggered.

Note, too, that Congress made the safe harbor conditional. By its terms, § 4052(f)(1) provides that a tractor that has been repaired or modified is not subject to the 12% tax *if*, *and only if*, the cost of those repairs or modifications is less than or equal to 75% of the price of a comparable new tractor.

Complicating matters is the absence in the excise tax and the safe harbor of any definition of the terms "repairs," "modifications," or "retail price of a comparable new article." Nor has the IRS promulgated any implementing regulations defining these terms. Much of this appeal hinges on the meaning (and limits) of these terms.

### B

Schneider National Leasing purchases truck tractors and trailers and leases them to its parent company, Schneider

National, Inc., one of the nation's largest trucking companies. At any one time, Schneider National Leasing owns several thousand tractors and tens of thousands of trailers and containers. To keep up with demand from drivers for updated rigs and to maintain the health of its fleet, the company purchases more than 3,000 semi-tractors each year.

From 2011 through 2013, rather than retiring a large set of older tractors and purchasing all new replacements, Schneider took a different tack. It bought 61 new tractors, the Freightliner Cascadia 125 model, but also decided to overhaul 982 of its existing tractors using new and refurbished parts packaged together in so-called glider kits. This decision made strategic business sense. For one, Schneider's older tractors were lighter and realized better fuel economy than newer models subject to more stringent environmental regulations. By refurbishing older models, Schneider could keep these more fuel-efficient tractors in its fleet. For another, Schneider's tax advisors counseled that the company would have to pay the 12% excise tax if it bought new tractors but could avoid the tax by refurbishing tractors in the existing fleet.

Following this advice, Schneider purchased 982 glider kits—bundled assemblies of new and remanufactured tractor components—from Daimler Trucks North America LLC. At a minimum, each glider kit came with a cab, chassis, radiator, front axle, front suspension, front wheels, front tires, front brakes, brake system, and trailer connections. 912 of these kits were so-called powered glider kits because they included a remanufactured engine. Daimler assembled these parts together, as shown below, in a manner resembling a tractor cab and chassis and shipped the kits to Schneider's outfitters.

 

Supp. App. 3; Richard K. Lattanzio & Sean Lowry, Cong. Rsch. Serv., R45286, *Glider Kit, Engine, and Vehicle Regulations* (Aug. 10, 2018).

Schneider contracted with third-party outfitters to perform the refurbishments from January 2011 to December 2013. That process entailed the outfitters matching Schneider's old tractors with a glider kit and combining the parts to create overhauled tractors. The refurbishing process generally involved dismantling the old tractors, stripping non-usable parts, reassembling the reusable components of the old tractor with the glider kit parts, and giving the rebuilt tractor a new vehicle identification number matching the serial number on the glider kit. The precise parts from the old tractors that were combined with each glider kit varied, but in many instances the outfitter reused the transmission, driveline, rear axle, rear suspension, and rear wheel hubs—and sometimes the fuel tank, fifth wheel, and rear brakes—in the refurbished tractors. Schneider sent the old engines to Daimler in exchange for a rebate on the refurbished engines included in the glider kits. Whatever components of the old tractors that remained were either kept as replacement parts for future repairs or sold for salvage value.

Schneider had paid the 12% excise tax when it first purchased these 982 trucks as required by 26 U.S.C. § 4051(a)(1).

But the company did not pay the excise tax on any of the 982 refurbished tractors. Rather, Schneider invoked the safe harbor in § 4052(f)(1) for repairs or modifications and took the position that the overhauled tractors were exempt from the excise tax.

The IRS disagreed, determining that only six of the 982 total tractors qualified for the safe harbor. In the Service's view, Schneider triggered the 12% excise tax obligation in § 4051(a)(1) upon leasing these "articles"—"tractors of the kind chiefly used for highway transportation"—to its parent company, an action that the statute treats as a "first retail sale" of an article. 26 U.S.C. § 4051(a)(1); see *id.* § 4052(a)(2). The IRS concluded that the safe harbor in § 4052(f)(1) could not shield 912 of the overhauled tractors—those that received new engines—because the refurbishment process using powered glider kits exceeded permissible "repairs or modifications" and instead resulted in the manufacture of new "articles." In more technical terms, no existing "articles" had been "repaired or modified," so the safe harbor did not apply.

The IRS found the safe harbor unsatisfied for an alternative reason. Even if the refurbished tractors qualified as having been repaired or modified, the Service determined that the cost of repairs exceeded 75% of the retail value of a comparable new tractor, disqualifying nearly all of Schneider's refurbished tractors from § 4052(f)(1)'s protection. In the end, then, the IRS denied Schneider the safe harbor and assessed the company $9,387,403.73 plus interest in unpaid excise tax over 12 quarterly periods from January 1, 2011 through December 31, 2013.

Schneider paid the excise tax on 12 tractors—one for each quarterly tax period at issue—and then filed an

administrative claim for a refund of that amount. The IRS denied the refund claim, paving the way for Schneider to pursue a tax refund action in federal court.

In May 2017 Schneider initiated a federal lawsuit pursuant to 26 U.S.C. § 7422(a) and 28 U.S.C. § 1346(a)(1) asserting that the IRS erroneously assessed excise taxes on its refurbished tractors. Schneider's complaint sought a refund of the $157,683.64 it paid in excise taxes for the 12 tractors and an abatement of the full amount of the IRS's tax assessment. For its part, the government maintained that the safe harbor did not apply and filed a counterclaim to reduce to judgment the unpaid balance of the full tax assessment.

## C

Schneider and the government stipulated to nearly all pertinent facts and the district court held a one-day bench trial in February 2020 on the remaining issues. By the time of the trial, the government conceded that the safe harbor applied to 64 of Schneider's refurbished tractors—those upgraded using non-powered glider kits that did not contain engines—if the cost of repairs fell below the 75% limit in § 4052(f)(1). That left two issues for the district court to resolve: first, whether the safe harbor applied to Schneider's 912 tractors refurbished using powered glider kits (containing remanufactured engines); and second, how to measure "the retail price of a comparable new article" as those terms are used in § 4052(f)(1) to determine the 75% threshold.

The district court began with the text of § 4052(f)(1). Congress provided that a tractor "shall not be treated as manufactured or produced" (and thus not subject to the excise tax) "solely by reason of repairs or modifications to the article …

if the cost of such repairs or modifications does not exceed 75 percent of the retail price of a comparable new article." 26 U.S.C. § 4052(f)(1). This language, the district court reasoned, established a two-step process for qualifying for the safe harbor. Schneider first had to show that it made "repairs or modifications" to specific tractors, and only then did the safe harbor require an assessment of whether the cost of those repairs or modifications exceeded the 75% limit. Put another way, the district court read § 4052(f)(1) to require a threshold determination of whether the taxpayer's refurbishing was so extensive to cross the line of "repairs and modifications" and instead constitute an act of manufacturing.

With respect to the 912 powered glider kits, the district court concluded Schneider could not satisfy the first step. The safe harbor, the court reasoned, did not encompass situations where a company combines a glider kit with only a few parts from a used tractor, resulting in the creation of an effectively new tractor. The district court did not explain its understanding of the terms "repairs or modifications," nor did it offer guidance about how many repairs can be made, or how extensively a tractor can be modified, before the changes qualify as the manufacture of a new tractor. Instead, the court looked at the facts and determined that Schneider's refurbishments using powered glider kits resembled the creation of new tractors—not repairs or modifications to existing tractors. The safe harbor therefore did not apply, so Schneider owed the 12% excise tax on these 912 tractors.

The remaining question concerned the meaning in the safe harbor of "the retail price of a comparable new article," the benchmark for the 75% limit on the cost of repairs and modifications. The district court agreed with the government's

view that the term "retail price" in § 4052(f)(1) referred to the price paid at the first retail sale—meaning, the price that Schneider actually paid (net of any discounts) for comparable new tractors, rather than the industry retail price on the open market.

After ruling in the government's favor on both issues, the district court instructed the parties to calculate the total amount that Schneider owed to the IRS. The court entered final judgment one month later, ordering Schneider to pay $9,017,513.15 in unpaid excise taxes plus interest and costs.

Schneider now appeals.

## II

As in any statutory interpretation dispute, the "proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019). Once more, Congress established the safe harbor in these terms:

> An article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications to the article (including any modification which changes the transportation function of the article or restores a wrecked article to a functional condition) if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article.

26 U.S.C. § 4052(f)(1).

Our own examination of this language leads us to two conclusions: first, the safe harbor does not contemplate a measurement for "repairs or modifications" apart from the

75% test Congress expressly incorporated into the statutory text; and second, the appropriate measurement for the "retail price of a comparable new article" is the market price in ordinary, arms-length transactions.

A

Several initial observations are plain from the text of § 4052(f)(1). To begin, the safe harbor instructs that something otherwise constituting an act of manufacturing "shall not be *treated* as manufacture[]" for the purpose of assessing excise tax liability. 26 U.S.C. § 4052(f)(1) (emphasis added). Congress designed the boundaries of this safe harbor by defining—or perhaps deeming—what shall *not* be considered manufacture: "repairs or modifications" made to an article that do not exceed in cost "75 percent of the retail price of a comparable new article." *Id.*

Although the statute does not explicitly define "repairs or modifications," it gives some meaning to these terms by offering a parenthetical to confirm what those terms include. The "repairs or modifications" within the safe harbor, Congress made clear, "includ[e] any modification which changes the transportation function of the article or restores a wrecked article to a functional condition." *Id.* The word "including" is a broadening term of illustration, informing us that the universe of "repairs or modifications" covered by the safe harbor goes beyond the two examples provided. See *Hammer v. United States Dep't of Health & Hum. Servs.*, 905 F.3d 517, 527 (7th Cir. 2018); Antonin Scalia & Bryan A. Garner, *Reading Law* 132 (2012); see also *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 99–100 (1941) (according significance to Congress's use of the term "including" in a tax statute and applying a broad construction).

The substance of the parenthetical also confirms the broad sweep of "repairs or modifications." We know from the parenthetical that a tractor that has been wrecked can be restored to working condition without the refurbishing constituting the manufacture of a new tractor, so long as the cost of restoration falls below the 75% threshold. See § 4052(f)(1). A tractor, for example, might sustain major damage in a head-on collision and require a new engine and cab (perhaps bundled in a powered glider kit) to be restored to working condition. The parenthetical in § 4052(f)(1) confirms that such a large-scale "repair" can qualify for the safe harbor so long as the cost does not exceed the 75% limit.

We also know from the parenthetical that "repairs or modifications" encompass alterations "which change[] the transportation function of the article." *Id.* Thus, a company that takes a tractor in good working order and changes its transportation function, by, for example, converting it into a wrecker vehicle with a crane, or altering it from a straight truck (with the trailer attached to the cab) to a truck tractor (pulling a load on a separate semitrailer), can also qualify for the safe harbor if the modifications meet the 75% condition.

These examples demonstrate that "repairs or modifications" can be extensive and substantial, and yet still qualify for the safe harbor if they satisfy the 75% test. The limiting condition for the safe harbor's protection, then, is not found in definitions of "repairs or modifications" versus "manufacture," but rather derives from the 75% threshold.

The conditionality of the safe harbor works in the other direction as well. Some repairs and modifications will be significant enough to constitute manufacture of a tractor subject to the 12% tax—when the cost of repairs surpasses the 75%

limit. See *id.* Suppose, for example, that the cost of upgrading a worn tractor (with over one million miles) with a top-of-the-line engine costs 80% of the retail price of a comparable new tractor. There is no question that the safe harbor would not apply—not because an engine replacement cannot be a "repair," but instead because the cost of that alteration exceeds 75% of a comparable new article.

The takeaways are clear. Congress's establishment of the 75% limit as a condition for qualifying for the safe harbor means that the question whether a repair or a manufacture occurred is not answered by looking at what replacement parts—which ones or how many—were used as part of refurbishing. What marks the line between "repairs or modifications" and "manufacture" is the 75% cost measurement. That Schneider elected to refurbish its tractors using powered glider kits does not disqualify those tractors from the safe harbor. What would disqualify them, though, is if the cost of refurbishments exceeds 75% of the retail price of a comparable tractor.

B

The government begs to differ with these conclusions. First, it urges us to focus on the reality of what Schneider's refurbishment process looked like: a used tractor was dismantled, a few parts were recovered and combined with ones from a new glider kit, and any components left behind were scrapped. In practical terms, the government contends, Schneider's process resembled the production of a new tractor, and calling it a repair or modification is to read absurdity into the statute.

At one level we agree. No doubt the terms "repair" and "modification" have distinct meanings and are not one and the same as "manufacture." Compare *Repair*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 991 (10th ed. 1994) (defining "repair" as "to restore by replacing a part or putting together what is torn or broken; to restore to a sound or healthy state"), *Repair*, BLACK'S LAW DICTIONARY 1553 (11th ed. 2019) (defining the noun "repair" as "[t]he process of restoring something that has been subjected to decay, waste, injury, or partial destruction, dilapidation, etc."), *Modification*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 748 (defining "modification" as "the making of a limited change in something"), and *Modification*, BLACK'S LAW DICTIONARY 1203 (meaning a "change to something; an alteration or amendment"), with *Manufacture*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 709 (defining the noun "manufacture" as "something made from raw materials by hand or by machinery" and the verb form as "to make into a product suitable for use"), and *Manufacture*, BLACK'S LAW DICTIONARY 1154 (meaning a "thing that is made or built by a human being (or by a machine), as distinguished from something that is a product of nature").

But we cannot interpret these words divorced from the statute, so any initial intuition that the terms bear distinct meanings must account for how Congress used them in the text of § 4052(f)(1) itself. See *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019) (emphasizing that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme" (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)).

By its terms, § 4052(f)(1) tells us that some, but not necessarily all, "repairs" may be so extensive that they result in new "manufacture." The safe harbor then directs us not to define what does (and does not) constitute "manufacture" with qualitative standards. Rather, the statute provides a quantitative test based on cost, precisely the type of definitive and mechanical assessment emblematic of a tax safe harbor. Taken in context, then, the term "repair" includes restoring and refurbishing an older tractor, including by using a glider kit—so long as the taxpayer stays within the 75% test.

What most stands out from the government's position is what is missing. The government offers no principled test (for that matter, no test of any kind) for deciding when changes to a tractor cross the line from repairs to new manufacture—it only insists that the facts here fall on the manufacturing side of the line. Such an undefined standard offers no standard at all, and indeed is antithetical to the nature of a safe harbor, which is intended to offer clear and certain guidance to taxpayers. See *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 729 (7th Cir. 2004), as amended (Sept. 3, 2004) (recognizing that ambiguity in the meaning of a statutory requirement to claim a safe harbor is problematic because, "[u]nless it is possible to give a concrete and reliable answer, the harbor is not 'safe'"); see also *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729 (6th Cir. 2013) (emphasizing that Congress enacted a safe harbor to eliminate legal uncertainty and used "precision in defining the boundaries," and rejecting an interpretation that "would reintroduce much of the uncertainty the safe harbor meant to eliminate").

What the government too discounts is that Congress prescribed the dividing line through a measurement of cost, not

on some less-than-objective assessment of whether the over-hauling and refurbishing process visually resembled the creation of a new tractor. The best reading is that the safe harbor itself supplies the demarcation between repairs and manufacture through this 75% limit on the cost of modifications and repairs. That interpretation gives effect to the conditional way Congress chose to write the safe harbor.

The government fares no better in its alternate argument that the critical limiting term in the statute is the phrase "the article." The safe harbor instructs that "[a]n article described in section 4051(a)(1) shall not be treated as manufactured or produced solely by reason of repairs or modifications *to the article*." 26 U.S.C. § 4052(f)(1) (emphasis added). Congress's use of the definitive "the," the government contends, demands that the same identifiable article exist before and after the repairs or modifications. True enough, the safe harbor speaks in terms of a single article. But § 4052(f)(1) does not contemplate an assessment—separate and apart from the 75% test—of whether the refurbishments are so fundamental that the core identity of the original article is lost and a new article comes into existence.

Here, too, the government offers no test for determining whether the same identifiable article survived the refurbishment process. When pressed at oral argument, the government posited that the immutable core of a single, identifiable tractor is comprised of the parts that make it a self-propelled vehicle. But this position finds no basis in the language of § 4052(f)(1) or its implementing regulations. And the statutory text contradicts the government's view. We know from the statute that a wrecked tractor needing a replacement engine is a circumstance within the safe harbor, so long as the

cost of the overhauled or new engine fell under the 75% limit. Congress did not limit the safe harbor's application to repairs and modifications that affect only ancillary components outside of the powertrain that propels the vehicle.

The government's inability to offer any competing interpretation of the terms "repairs" and "modifications" is telling. Only one part of the statute addresses how many changes to a tractor are too many to constitute mere repair and thus result in the manufacture of a new tractor: the 75% limit on the cost of repairs. The plain text of the safe harbor does not contemplate any measurement apart from this 75% test.

C

Our construction and interpretation of § 4052(f)(1) find reinforcement in historical context, which reveals that the IRS has long recognized that the safe harbor applies to refurbishments that extend a worn tractor's useful life.

Before Congress first proposed a statutory safe harbor, the task of determining whether modifications to a tractor qualified as the manufacture of a new vehicle triggering the excise tax fell to the courts, with the analysis proceeding on a case-by-case basis. See, *e.g.*, *Ruan Fin. Corp. v. United States*, 976 F.2d 452, 455 (8th Cir. 1992); *Boise Nat. Leasing, Inc. v. United States*, 389 F.2d 633, 634 (9th Cir. 1968).

In *Boise National Leasing*, for example, the Ninth Circuit approved a qualitative test that involved looking at the extent and nature of changes to a vehicle to decide whether they crossed the line from repair to manufacturing. See 389 F.2d at 636. The court acknowledged that the "dismantling of an old truck, with a repairing, reconditioning, replacing of some parts, and a reassembling of the truck elements" might not

"constitute the manufacturing of another truck." *Id.* But modifications did qualify as manufacture when "what was done constituted on its form, substance, and result, not a repairing or reconditioning of the old truck structures or entities with an incidental replacement of some existing part or parts thereof, but the creating of other structural assemblies and functional entities." *Id.* at 635. If that reasoning sounds familiar, it is because it parallels the government's position here.

But Congress moved away from this qualitative approach in 1988, when a committee first proposed a bright-line safe harbor set at the 75% cost mark for repairs or modifications that extended a vehicle's useful life. See H.R. 4333, 100th Cong. (1988). The proposal failed, but the IRS reacted in 1991 by adopting the congressional committee's proposed safe harbor in Revenue Ruling 91-27. The advisory ruling considered two distinct scenarios: one involving a "worn" vehicle that is extensively restored to extend its useful life, and the other involving a "wrecked" vehicle that incurred damage after a collision and required extensive repairs to restore it to a functional condition. See Rev. Rul. 91-27, 1991-1 C.B. 192. In the former situation only—where restorations extend the useful life of a worn tractor, even through the use of a glider kit—the IRS expressly instructed that no excise tax would apply if the cost of restoration did not exceed 75% of the price of a comparable new vehicle. See *id.* (explaining that "[t]his holding will also apply in cases where the owner uses a glider kit to repair the vehicle, so long as the cost of the repair does not exceed 75 percent of the price of a comparable new vehicle"). As the IRS itself recognized, this Revenue Ruling replaced the subjective, fact-specific approach characterized in *Boise National Leasing* with a bright-line rule set at 75% of the cost of a comparable new vehicle. See *id.*

Both parties agree (and the government further confirmed during oral argument) that when Congress enacted § 4052(f)(1) six years later, it codified the IRS's safe harbor in the Tax Code and also extended eligibility to two other categories of modifications—for wrecked articles and changes in transportation function. There is no evidence that Congress, by expressly identifying wrecked articles and changes in function in the parenthetical within the text of § 4052(f)(1), altered the preexisting, IRS-recognized safe harbor protection for a worn vehicle that has been extensively restored to extend its useful life. As we see it, Schneider's use of powered glider kits to refurbish 912 tractors were refurbishments to extend the useful life of worn tractors, the precise scenario addressed in Revenue Ruling 91-27 that carried through in Congress's enactment of § 4052(f)(1).

Right to it, then, whether Schneider's refurbishments resembled manufacturing as a practical matter is not dispositive to the applicability of the safe harbor. Section 4052(f)(1) itself provides that what otherwise might look like the manufacture of a new tractor "shall not be treated as manufacture[]" when the taxpayer complies with the 75% cost limitation. The district court erred in concluding otherwise.

### III

Remember, though, that it is not enough that Schneider's refurbishments using glider kits constituted repairs or modifications. The safe harbor is conditional, and only exempts repaired tractors from the excise tax "if the cost of such repairs and modifications does not exceed 75 percent of the retail price of a comparable new article." 26 U.S.C. § 4052(f)(1). The parties agree on what tractor model is a comparable new article—the Freightliner Cascadia 125 tractor—but disagree on

the meaning of "retail price." The answer matters because 75% of that "retail price" establishes the ceiling for the cost of repairs and modifications that can be performed without triggering the excise tax.

Schneider contends that "retail price" means the price at which products are sold to consumers in small quantities in the open market. The company offered expert testimony at the bench trial that a resource called the Truck Blue Book provides retail price information by aggregating data from actual transactions to determine the ordinary price paid by consumers in the open market. The government, on the other hand, asserts that "retail price" reflects the price the taxpayer actually paid for comparable tractors, including any discount off the market price. Here, the price Schneider paid was closer to a wholesale price, because the company purchased 61 Cascadia tractors in bulk directly from the manufacturer rather than through a distributor or dealer.

Congress did not define the "retail price of a comparable new article" in the § 4052(f)(1) safe harbor. Nor do the implementing regulations supply any definition. Regardless, Congress elected to use the term "retail price," and we "ordinarily assume, 'absent a clearly expressed legislative intention to the contrary,' that 'the legislative purpose is expressed by the ordinary meaning of the words used.'" *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 769 (2019) (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982)).

The plain meaning of the noun "retail" is "the sale of commodities or goods in small quantities to ultimate consumers," and the adjective form of "retail" means "of, relating to, or engaged in the sale of commodities at retail." *Retail*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 999; see also *Retail*,

BLACK'S LAW DICTIONARY 1573 (defining retail as "[t]he sale of goods or commodities to ultimate consumers, as opposed to the sale for further distribution or processing"). We also know that the term "price" is "the amount of money given or set as consideration for the sale of a specified thing." *Price*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 924; see also *Price*, BLACK'S LAW DICTIONARY 1439 (defining price as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold").

Reading the two words together, then, "retail price" reflects the amount at which an article is sold in individual, arms-length transactions to end consumers on the open market. Accord *Oshkosh Truck Corp. v. United States*, 123 F.3d 1477, 1480 (Fed. Cir. 1997) ("When a manufacturer sells directly to the end-user, *i.e.* at a retail sale, the price at which it sells is the 'retail price' as that is the price at which these items are being sold in the marketplace.").

This construction finds reinforcement in the fact that Congress used different language in other parts of the excise tax statute when referring to the price the taxpayer actually paid. In the provision imposing the excise tax, § 4051(a)(1), Congress specifically directed that the tax be imposed on "the amount for which the article is so sold." Yet the safe harbor uses the term "retail price" and not "price paid" or "cost paid." If Congress had intended to set the benchmark for the 75% calculation in the safe harbor at the price that the taxpayer actually paid for comparable tractors—for Schneider, an amount closer to wholesale prices—it could have instead referenced "the amount for which a comparable new article is so sold." But the safe harbor includes the term "retail," and

we must assume Congress intended each word of the statute to have meaning. See *Parker Drilling Mgmt. Servs.*, 139 S. Ct. at 1890 (reiterating the "'cardinal principle' of interpretation that courts 'must give effect, if possible, to every clause and word of a statute'" (quoting *Loughrin v. United States*, 573 U.S. 351, 358 (2014)); Scalia & Garner, *Reading Law* 174 (emphasizing the same point).

The broader context in which the safe harbor operates further reinforces our interpretation of "retail price." See *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 893 (2018) (explaining that statutory context can be probative). The provision imposing the excise tax, § 4051(a)(1), is written in terms of single transactions of individual articles, and the safe harbor in § 4052(f)(1) likewise concerns repairs made to discrete articles. The safe harbor envisions a scenario where the owner of a used tractor has a choice to make, and decides to undertake "repairs or modifications" to an existing tractor instead of purchasing a new one at "retail." The plain import of this framework, crafted in terms of a single transaction, is that the relevant comparator is the price of a single comparable tractor in the open market. Neither the safe harbor (in § 4052(f)(1)), nor the provision imposing the tax (in § 4051(a)(1)), contemplates a metric for the maximum permitted cost of "repairs and modifications" that differs for large versus small trucking companies, or for bulk versus individual purchases.

The government's contrary position would leave practical questions unanswered. Schneider happened to have purchased comparable tractors during the tax periods at issue, so we know the price it actually paid for the Cascadia tractors. But that will not always be so. In the precise situation contemplated by the safe harbor—where a company chooses to

modify or repair a worn or wrecked tractor instead of purchasing a new one—the taxpayer would necessarily need to look at the price paid by other buyers in the open market by, for example, consulting the Truck Blue Book.

Another aspect of the government's position warrants a response. By the government's reading, the term "retail price" must refer to the price paid at the "first retail sale" as that term is defined in § 4052(a)(1). Here, the "first retail sale" of the comparable Cascadia tractors occurred when Schneider purchased them from Daimler during the relevant tax years. The government therefore takes the position that the discounted price Schneider paid in this "retail sale" should supply the "retail price of a comparable new article" when assessing the safe harbor. Not so in our view.

We do not read the statutory language in § 4052(f)(1) to impose such a price matching requirement. Yes, we generally presume that identical words used in different parts of the same statute bear the same meaning. See *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722 (2017). But the observation that the word "retail" appears in both the safe harbor and the provision imposing the tax does not convince us that the "retail price of a comparable new article" in the safe harbor must be fixed at what that same taxpayer *would* pay if they bought the comparable tractor in a "first retail sale."

Congress used the term "retail" in various places throughout the statute. See, *e.g.*, § 4051(a)(1) (imposing the tax on the "first retail sale"); § 4052(b)(2) (instructing that where an article is sold at less than fair market price, the tax shall be calculated "on the price for which similar articles are sold at retail in the ordinary course of trade"); § 4052(a)(3)(C) (providing that, when use is treated as the first sale, the "tax shall be

computed on the price at which similar articles are sold at retail in the ordinary course of trade"); § 4052(b)(3)(B) (defining a presumed markup percentage as "the average markup percentage of retailers of the articles of the type involved"); § 4052(b)(4)(B)(ii) (providing an exception for a "permanent retail establishment"). These provisions show that Congress sometimes used the term "retail" as a noun and other times as an adjective. But, contrary to the government's insistence, we cannot conclude that in each instance Congress meant the taxpayer's precise purchase and the price it actually paid. The question before us is not as easily answered as the government would have it.

The "fundamental canon of statutory construction"—that "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning"—resolves this issue. *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). The statute offers no definition for the "retail price of a comparable new article," so we presume that the ordinary meaning of the language expresses Congress's intent. See *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194 (1985). What that means here is that the "retail price" referred to in § 4052(f)(1) is the price at which a comparable tractor could be acquired in the open market. Our determination necessitates a new assessment by the district court of whether the cost of Schneider's refurbishments exceeded 75% of the "retail price of a comparable new article." 26 U.S.C. § 4052(f)(1).

For these reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.